### IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOEL SNIDER** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 18-801** |
| | : | |
| **ROBIN ALVAREZ AND PSS** | : | |
| **STEVENS** | : | |

## <u>MEMORANDUM</u>

**KEARNEY, J.**                                                                **November 2, 2020**

      Joel Snider is serving a thirty to sixty-year sentence in Pennsylvania prisons after pleading

guilty but mentally ill to murder and burglary in Pennsylvania state court. He faces serious episodic

challenges to his mental health. Since pleading guilty over six years ago, he repetitively files both

counselled and *pro se* lawsuits against federal and state judges, prison officials, doctors, and others

supervising him in Pennsylvania prisons. He now has lawsuits pending before at least three federal

judges challenging the way in which different Pennsylvania prisons address his mental health or

prison conditions. He generally focuses his scattered *pro se* allegations before us on his theory

Pennsylvania is required to provide him, as a disabled man based on sporadic episodes of mental

illness, with a certain desired level of legal services to help him litigate both his cases and help

other incarcerated persons litigate their cases. When he does not understand his own pleadings or

the court process, he seeks mental health treatment from prison officials. When the state actors do

not help him to the level he desires, he files grievances. When the state actors deny his grievances,

he claims they are discriminating or retaliating against him for his protected activity under the First

Amendment and Americans with Disabilities Act.

      We today address the sufficiency of Mr. Snider's civil rights and Pennsylvania law claims

against Pennsylvania prison officials and medical professionals treating him from July 2017 until

December 2018 at SCI-Somerset. Mr. Snider claims these state actors caused him psychological injury and frustrated his legal claims in an earlier lawsuit also pending before us, *Snider v. Pennsylvania Department of Corrections*, No. 15-951 ("*Snider I*"), and in his appeal from post-conviction relief in his state court criminal conviction which led to his lengthy sentence.

After parsing through the 338 paragraphs of allegations, we dismiss all claims and parties other than Mr. Snider's Eighth Amendment claim for deliberate indifference relating to the denial of mental health therapy and treatment by Psychological Services Staff Robin Alvarez and  f/n/u Stevens. We dismiss all other claims against all other defendants as Mr. Snider otherwise does not plead a claim.  We will proceed into discovery on this Eighth Amendment deliberative indifference claim against these two state actors. His remaining claims are dismissed.

## I.      Background necessary to understand Mr. Snider's varied claims.

Mr. Snider sues to "address the impeding and frustrating of [his] attempts to have meaningful court access for the claims he is attempting to present in" *Snider I* and his state court post-conviction petition.[1] He challenges the conduct of the Pennsylvania Department of Corrections, the Secretary of the Department of Corrections, Director of the Pennsylvania Board of Probation and Parole, various prison officials and employees, and Department of Corrections physician Dr. Sheikh.[2] Mr. Snider brings civil rights claims alleging violations of his rights under the First, Sixth, Eighth, and Fourteenth Amendments; violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111, *et seq.* and the Rehabilitation Act, 29 U.S.C. § 794; and Pennsylvania state law claims including a medical negligence claim against Dr. Sheikh and a defamation claim.

He alleges the Department of Corrections discriminated against him on the basis of his mental health disability and excluded him from programs, activities, and services including "the

law library, legal research, production of legal documents, meaningful access to the court, recreation, socialization, general living, housing, adjustment, conferral with counsel, religious services, employment, mental health services, grievance services, etc. and has made his participation unusually difficult."[3] He alleges the Department of Corrections "regards him" as having personality disorder, a diagnosis which he contests.[4] He alleges Defendants' conduct is impeding and frustrating his post-conviction relief action in state court and his "contemplated challenges" to prison conditions in *Snider I*.[5]

Mr. Snider asks we declare all "defendants" violated his rights and award him damages in an unspecified amount, as well as injunctive relief "to address ongoing retaliation, obstruction, defamation, exclusion, and failure to accommodate"; a "name-clearing hearing"; costs; and other equitable relief.[6]

### A.   Mr. Snider's underlying state court conviction.

Mr. Snider is sitting in state prison serving a thirty to sixty-year sentence for murder and burglary. In July 2010, police arrested Joel Snider for murder and other charges for the shooting death of Sudharman Joseph Fenton in Union County, Pennsylvania. After an October 12, 2010 preliminary hearing, a magisterial district judge bound the charges against Mr. Snider over for trial. Mr. Snider alleges incarceration as a pretrial detainee from September 2010 to August 2014 at the Union County prison, the Snyder County prison, the Clinton County Correctional Facility, and state prisons operated by the Pennsylvania Department of Corrections including SCI-Coal Township, SCI-Camp Hill, SCI-Greene, and Torrance State Hospital.[7]

On August 8, 2014, Mr. Snider entered into a negotiated plea of guilty but mentally ill to one count of third-degree murder and one count of burglary. Mr. Snider received a sentence at the time of his plea to the agreed upon aggregate term of thirty to sixty years' imprisonment. It is

unclear where the Department of Corrections housed Mr. Snider between August 8, 2014 and July 5, 2017.[8] On July 6, 2017, the Department of Corrections moved Mr. Snider to SCI-Somerset.[9]  In his amended Complaint, Mr. Snider challenges only the conduct at SCI-Somerset beginning July 6, 2017.

### B.    Mr. Snider's motion for post-conviction relief in state court.

On September 11, 2015, Mr. Snider moved for post-conviction collateral relief under the Post-Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. § 9541, *et seq.*[10]  On November 10, 2016, the Union County Court of Common Pleas granted, without a hearing, the Commonwealth's Motion to dismiss Mr. Snider's PCRA petition, including ineffective assistance of counsel to file a timely direct appeal.[11] Mr. Snider appealed to the Pennsylvania Superior Court. On November 21, 2017, the Pennsylvania Superior Court vacated the trial court's order dismissing Mr. Snider's PCRA petition and remanded.[12] The Superior Court did not address the merits of Mr. Snider's PCRA petition, instead concluding Mr. Snider's requite for *nunc pro tunc* relief to file a direct appeal should have been considered a PCRA petition and Mr. Snider should have been appointed counsel.[13]

After remand, the PCRA court held a hearing on Mr. Snider's petition and, on June 7, 2019, denied Mr. Snider's amended PCRA petition.[14] On July 8, 2019, Mr. Snider, represented by appointed counsel, appealed the PCRA court's decision.[15] On October 30, 2020, the Pennsylvania Superior Court affirmed the denial of his PCRA petition and the PCRA court's finding Mr. Snider did not establish his burden of proving he requested a direct appeal. The  case remains in the appellate courts for at least the next thirty days to allow possible appeals.[16]

### C.    Mr. Snider's pending claims in *Snider I*.

On May 7, 2015, Mr. Snider filed an action, captioned *Snider v. Pennsylvania Department of Corrections*, No. 15-951, in this Court. He alleged defendants—over seventy entities and individuals including the Commonwealth of Pennsylvania, the Pennsylvania Department of Corrections, the United States, the United States District Court for the Middle District of Pennsylvania, Pennsylvania's Unified Judicial System, the Pennsylvania Attorney General's office, and various prison officials and corrections officers—violated his rights under the Americans with Disabilities Act and the Rehabilitation Act, the United States Constitution, and Pennsylvania law.[17]

Mr. Snider alleges he is disabled within the meaning of the Americans with Disabilities Act, 42 U.S.C. §§ 12131, 12181 and Rehabilitation Act, 29 U.S.C. § 794 because of mental illness and a hearing impairment.[18] In *Snider I*, Mr. Snider claims: (1) denial of access to the "programs, activities and services or judicial proceedings" in his state criminal action including his PCRA action from July 7, 2010 to the present; (2) conditions of confinement beginning in December 2012; and (3) retaliation for filing grievances from December 2012 to May 2013, August 2014, and May 2013 to May 2015 at multiple state and county correctional facilities.

The operative complaint in *Snider I*—the second amended complaint—remains pending with Defendants filing nine separate motions to dismiss. Mr. Snider responded to some, but not all of the motions. The motions to dismiss remain pending.

### D.    Department of Corrections' policy on access to legal services.

The Department of Corrections' "Access to Provided Legal Services" policy DC-ADM 007 effective April 13, 2015 (the "Policy") provides: "It is the policy of the Department that legal

5

reference materials are acquired, maintained, and made available to an inmate, and that assistance in the use of legal reference materials is made available to an eligible inmate."[19]

The Policy is broken into two sections: (1) Law Libraries and Services; and (2) Inmate Access to Services. The first section provides, among other things, the acquisition and maintenance of law libraries, the operation of law libraries, and determining the need for extra time in a law library. The second section provides, among other things, legal assistance services to inmates who qualify. Eligibility for legal assistance is limited to inmates who: (1) are "legitimately illiterate"; (2) "lack the skills or comprehension to speak or understand English in its written form"; or (3) "have a disability that substantially interferes with his/her ability to use or understand legal materials."[20] "An otherwise eligible inmate is not entitled to legal assistance in a case where he/she is being represented by an attorney."[21]

The Policy provides "[e]ach facility will make legal assistance services available to an eligible inmate" consisting of "(a) information regarding available methods for informal dispute resolution, including the inmate grievance system; (b) provision of citations to procedural rules, statutes, and cases; (c) assistance in preparing documents stylistically and grammatically suitable for filing with a court or administrative agency; (d) assistance in using the law library and an explanation of the proper methods for conducting legal research and the drafting of pleadings and other documents to be filed *pro se* by the inmate with a court or administrative agency (but not actually drafting documents for the inmate); (e) identification of procedural forms that will assist an inmate in preparing documents to be filed in cases pending before a court or administrative agency; (f) assistance in locating mailing addresses for the courts and preparing envelopes for mailing; (g) reading selected and relevant prepared packages of information, inmate required cases or materials or correspondence or orders from the Court verbatim. The facility will provide for

non-employee translation services for a Non-English speaking inmate; and (h) transcription of an inmate's oral statements into documents or forms for the inmate to file in court. Such transcription services shall not include any legal advice (which constitutes the practice of law) to the inmate concerning the content of the filing. . . ."[22]

The Policy provides library staff "shall not engage in providing legal advice (advice regarding substantive or procedural adequacy of pleading or document) or engage in any activity that constitutes the practice of law."[23]

**II.  Alleged *pro se* facts along with Mr. Snider's self-diagnoses and legal conclusions.**

Mr. Snider concludes he is disabled by "severe mental illness" which "significantly limits his major life activities related to accessing court *pro se*."[24] Mr. Snider claims multiple diagnoses: schizophrenia, including schizophrenia of the paranoid type, depressed type, bi-polar type, and schizoaffective disorder; depression and major affective disorder depression with severe psychotic features; post-traumatic stress disorder; and bi-polar disorder.[25] Mr. Snider concludes he is disabled under the Americans with Disabilities Act which Prison Officials at SCI-Somerset refuse to accommodate.

Mr. Snider admits his disability is episodic and treatable with medications.[26] But, when his symptoms are active, he suffers from debilitating depression, paranoia, thought insertion, delusions, hallucinations, intense fear or panic, disorganized speech and thinking, confusion, compulsive behavior, self-harm, and suicide attempts.[27] These symptoms, when present, limit his ability to "perform legal research, understand statutes and court decisions, and write legal documents" and these activities at times "may be unusually difficult, take longer than non-disabled persons, or may become completely impossible."[28]

Mr. Snider concludes with allegations the Department of Corrections, Prison Officials, and Dr. Sheikh discriminated and retaliated against him on the basis of his disability in violation of the Americans with Disabilities Act and Rehabilitation Act and discriminated and retaliated against him for his attempts to access the courts and assisting other inmates with grievances in violation of his civil rights and defamed him. Mr. Snider alleges after arriving at SCI-Somerset on July 6, 2017, his mental health symptoms were in remission and treated with medication.[29] Mr. Snider paints a trouble-free picture of his first seven months at SCI-Somerset; he socialized with other inmates, obtained a paid job as a tutor in the prison's education department, enrolled in college correspondence courses to complete his bachelor's degree, developed good rapport with staff, received a reduction in his security custody level, and remained discipline-free.[30] Mr. Snider's situation at SCI-Somerset changed in February 2018 when Prison Officials began to harass and retaliate against him after he filed grievances, accessed the law library to pursue claims against the Department of Corrections and Prison Officials, and assisted other disabled inmates with grievances.[31]

### February 2018—Mr. Snider files his first grievance and helps other inmates with grievances.

On February 8, 2018, Mr. Snider gave Psychological Support Staff member Robin Alvarez mental health records from his 2013-2014 stay at Torrance State Hospital diagnosing him with schizophrenia and bi-polar disorder.[32] Psychological Support Staff Alvarez "falsified" his medical records by "attempting to hide" these diagnoses when she noted: "PSA . . . asked if he has documentation of his diagnosis in the community, which at this time he does not."[33]

Around the same time, the PCRA court scheduled a hearing in Mr. Snider's PCRA petition arising from his murder plea.[34] On February 12, 2018, Mr. Snider attended a hearing in his PCRA case by video conference. He could not adequately confer with his PCRA counsel and present

important evidence at the PCRA hearing because Grievance Coordinator Christine Schenk restricted his phone calls with his attorney to fifteen minutes.[35] Mr. Snider intended to call another inmate, Lennie Harvey, as a witness in his PCRA hearing. Incarcerated at SCI-Fayette, Mr. Harvey refused to testify for fear of retaliation.[36] Mr. Snider alleges Mr. Harvey's intimidation "may have occurred" because of the "well established practice of retaliation" maintained by the Department of Corrections, Secretary Wetzel, Superintendent of SCI-Fayette Mark Capozza, and the Director of Pennsylvania's Board of Probation and Parole and "could have been caused" by threats from John Doe Two.[37]

In the meantime, Mr. Snider requested a copy of his mental health file which Grievance Coordinator Schenk and two other non-parties refused to give him.[38] On February 14, 2018, Mr. Snider filed his first grievance after being denied his mental health file.[39] Two days later, on February 16, 2018, Mr. Snider received mail in *Snider I* which had been cut in half.[40]

On February 14, 2018, SCI-Somerset began a two week lockdown—apparently for the entire prison and for all inmates—requiring all inmates be locked in their cells for twenty-four hours a day.[41] Mr. Snider does not allege Defendants imposed a prison-wide lockdown in retaliation for filing a grievance or for his legal actions in *Snider I* and his state PCRA action.  Mr. Snider instead alleges the lockdown exacerbated his mental health symptoms causing excessive sleeping, disorganized thinking, and panic, making, in his estimation, his participation in a February 28, 2018 conference call with the court in *Snider I* on February 28, 2018 "impossible."[42] Mr. Snider alleges the Department of Corrections, Ms. Alvarez, and the "residential treatment team" knew isolation caused by the lockdown exacerbated his symptoms and knew he had a court hearing in *Snider I* on February 28, 2018 with Chief Magistrate Judge Susan Schwab.[43] He claims SCI-Somerset did not afford him disability accommodations during the lockdown, the law library

remained closed, and the Department of Corrections' counsel falsely represented to Judge Schwab the call needed to be "rushed." The docket reflects Mr. Snider participated in the February 28, 2018 call, but he concludes these conditions combined to deprive him meaningful participation in the court call with Judge Schwab.[44]

Mr. Snider also serves as a jailhouse lawyer. He assisted over ten disabled inmates with their grievances between February and November 2018.[45] According to Mr. Snider, all these inmates are disabled and do not know how to use grievance procedures or perform legal research and their disabilities limit their meaningful use of the law library and grievance procedure.[46]

### March 2018—Mr. Snider files a second and third grievance.

On March 7, 2018, Mr. Snider asked Law Librarian Dawn Davis for legal assistance and extra time in the library because **his pleaded claims** in *Snider I* were too complicated for him and his mental health disabilities limited his ability to "have meaningful access to court."[47] Mr. Snider requested accommodation under the Americans with Disabilities Act but Law Librarian Davis informed him he "did not quality for legal assistance" under Department of Corrections policy.[48] Mr. Snider filed a grievance for the denial of legal assistance.[49]

On March 21, 2018, Mr. Snider filed a grievance for the prison's failure to provide him with a disability accommodation for the February 28, 2018 hearing in *Snider I*.[50] After filing the grievance, Unit Manager Bowers (who is not a defendant) harassed and intimidated Mr. Snider, telling Mr. Snider he (United Manager Bowers) "hated grievances."[51]

On March 30, 2018, Psychological Services Staff member Alvarez told Mr. Snider "when I observe you interacting with other inmates on the block, I am noticing signs of anti-social personality disorder."[52] Mr. Snider concludes he does not have personality disorder and Ms. Alvarez fabricated this observation to later falsify his medical record.

*April 2018—Mr. Snider files this case.*

On April 10, 2018, Mr. Snider filed this case in response to Law Librarian Davis's refusal to provide him with legal assistance to help him understand his own claims in *Snider I*.[53] He met with Psychological Services Staff member Alvarez on April 24, 2018 and told her he suffered from anxiety and stress related to the *Snider I* litigation **he filed**.[54] Ms. Alvarez made a note in Mr. Snider's mental health record "inmate rambled on . . ." and he struggled with self-harm because of fear of retaliation from Prison Officials and "due to how unusually difficult his ability to access court had become" but failed to arrange for counseling, therapy, or "disability accommodations for these issues."[55]

The same day, Principal Jamison called Mr. Snider to his office to discuss Mr. Snider's grievance regarding access to the law library. There, Law Librarian Davis asked Mr. Snider to withdraw his grievance and Principal Jamison threatened to fire Mr. Snider from his job as a tutor because of the filed grievance.[56] Mr. Snider perceived Principal Jamison and Law Librarian Davis as angry and aggressive. Law Librarian Davis recognized Mr. Snider's disability but told him he "is not in active decompensation," told him she could not provide him with legal assistance or extra time in the law library under Department of Corrections policy, and if he has an issue he should file a grievance against Secretary Wetzel.[57] Mr. Snider contends Law Librarian Davis misled him in an attempt to obstruct the grievance procedure.

Mr. Snider then became so distraught as to be in mental health crisis requiring examination by Dr. Melissa Turkal.[58] Dr. Turkal examined Mr. Snider on April 25, 2018, changed his medications, noted Dr. Sheikh incorrectly changed his medications in March 2018 and failed to schedule a follow-up visit, and convened a meeting with the prison's psychological services to "discuss how they could provide accommodations and ensure his meaningful court access."[59] At

Dr. Turkal's suggestion, Mr. Snider prepared a proposal for psychological services to assist with his court actions. Non-party Unit Manager Bowers refused to distribute his proposal to psychological services.[60]

SCI-Somerset then moved him from one side of the Residential Housing Unit (the "Unit") to the other side of the Unit in retaliation for assisting other disabled inmates with grievances.[61] Mr. Snider purchased a $280 typewriter from the prison's commissary which broke.[62]

### May 2018—grievance denial, new request for mental health records, and additional legal actions filed.

On May 2, 2018, Deputy Superintendent of Facilities Management Caro spoke to Mr. Snider about his grievance challenging the denial of his request for a copy of his mental health file. Deputy Superintendent Caro expressed anger at Mr. Snider for filing the grievance. Deputy Superintendent Carol instructed Mr. Snider to make a second request for his mental health file to the Department of Corrections' Office of Chief Counsel despite an earlier denial. Mr. Snider made a second request.[63] The Office of Chief Counsel denied the second request.

Deputy Superintendent Caro denied Mr. Snider's grievance regarding his requested mental health records. Mr. Snider concludes the grievance denial is false and defamatory and he complained to non-party Superintendent Hainsworth.[64] On May 4, 2018, Superintendent Hainsworth met Mr. Snider on the Unit, "grabbed [his] papers and held them up to his face" and harassed him about his filed grievances.[65] Mr. Snider became distraught but Psychological Services Staff member Stevens did not arrange therapy, counseling, or disability accommodations for him and instead falsified his mental health record by noting, "[Inmate] was resistant to discussion that suggested he might have to change his behaviors to receive varied outcomes. Also attempted to discuss stress reduction plans and techniques. [Inmate] was dismissive and appeared annoyed at conversation."[66]

On May 21 and May 31, 2018, Mr. Snider filed two actions in the United States District Court for the Western District of Pennsylvania; *Snider v. Wittig*, No. 18-703, and *Snider v. Gilmore*, No. 18-735. Mr. Snider alleges he originally asserted the claims he alleged in *Wittig* and *Gilmore* in *Snider I* but separated them out of *Snider I* in accordance with Judge Schwab's directive.[67] He also alleges he assisted two other inmates with grievance appeals on May 25, 2018.[68]

### June 2018—falsification of mental health records and other acts of retaliation.

On June 1, 2018, Mr. Snider met with Psychological Services Staff member Alvarez to report his anxiety and stress, to complain about music played by an inmate in the cell below him, and cigarette smoking by inmates in the bathroom below his cell which prevented him from sleeping. He requested a move from his cell. Ms. Alvarez instructed Mr. Snider to request a move from the block officer or Unit Manager Bowers.[69] Psychological Services Staff member Alvarez made a note of her June 1, 2018 meeting with Mr. Snider: "PSS met with inmate . . . No acute MH concerns at this time . . . Inmate discussed his frustrations with the inmate below his cell playing a keyboard which is driving him nuts and makes him want to hurt himself. PSS encouraged inmate to consider that in prison others can implement their coping skills and for some, music is their coping skill. Inmate reported how he gets agitated quickly with others and has no regard for them although he understands that others have issues and rights – he just gets agitated by them."[70] Mr. Snider concludes this note is false and written in a way to make it appear he has symptoms of personality disorder.[71]

On June 3, 2018, Mr. Snider's father bought a law book which John Doe One stole and did not deliver to Mr. Snider.[72] Mr. Snider attempted to informally resolve the issue of the stolen book with non-party Unit Manager Bowers, Mailroom Supervisor Weigle, Business Manager Dennis

Decker and others. They refused to informally resolve the matter and directed Mr. Snider to file a grievance.[73] Mr. Snider purchased a watchband but Mailroom Supervisor Weigle did not notify him on delivery and forced him to file another grievance.[74]

On June 21, 2018, Mr. Snider attended a hearing in his PCRA case by video conference on his motion for appointment of new PCRA counsel. Mr. Snider alleges the moment he began to speak, the video "froze" denying him participation in the hearing. The court denied his motion. Mr. Snider believes John Doe Three intentionally caused the video conference equipment to malfunction with the intent to impede his court access.[75]

### August and September 2018—continued retaliation.

On August 9, 2018, Mr. Snider's counsel in another civil litigation went to SCI-Somerset to meet with him. Prison Officials turned counsel away. Mr. Snider concludes they falsely stated his counsel set off the metal detector.[76] On August 10, 2018, Psychological Services Staff member Alvarez again falsified Mr. Snider's mental health record to make it appear he is manipulative, faking his mental illness, and threatening self-harm to "gain things from staff" noting, ". . . Inmate was argumentative . . . PSS educated inmate how the teacher has communicated how well inmate does working with others for her and inmate stated, 'I know how to hide symptoms and when to display symptoms.' . . . inmate reported that he cannot go into GP [General Population] as he will have symptoms, bang his head, and attempt to kill himself in less than a month of being in GP [sic]."[77] On August 20, 2018, Mr. Snider helped another inmate file a grievance.

On September 2, 2018, Mr. Snider filed yet another lawsuit; this time suing the United States and the United States District Court for the Middle District of Pennsylvania.[78] He concedes he may have brought his claims under "the wrong statute," but attributes his possible error to Law Librarian Davis's and Principal Jamison's denial of legal assistance.[79] After filing the lawsuit, the

Department of Corrections diverted mail from his father to another inmate. When Mr. Snider complained about continuing retaliation, Ms. Alvarez, non-party Unit Manager Bowers, Mailroom Supervisor Weigle, Grievance Coordinator Schenck, Business Manager Decker, Deputy Superintendent Caro, and Superintendent Tice told him to "keep filing grievances."[80]

On September 7, 2018, Law Librarian Davis saw an affidavit from another inmate, Tyriek Sommerville, whom Mr. Snider intended to call as a witness in *Snider I*. Prison Officials then moved Mr. Sommerville from the Residential Housing Unit to general population.[81]

### October 2018—new grievances filed.

In early October 2018, someone or something turned off Mr. Snider's cable television service despite his payment and someone stopped one of his medications for five days.  Mr. Snider claims an unknown person turned off his cable service to retaliate for filing grievances but non-party Unit Manager Bowers told him to file a grievance.[82] On October 10, 2018, Mr. Snider filed a grievance regarding his cable television.[83]

On October 24, 2018, Mr. Snider filed another grievance alleging injury in *Snider v. United States*, No. 18-1789, which we dismissed on October 2, 2018, because Law Librarian Davis, Principal Jamison and "other PA DOC officials" denied him legal assistance.[84]

On October 29, 2018, after sending his broken typewriter away for repair, Mr. Snider's typewriter returned damaged with cracks and bent and missing pieces.[85] When Mr. Snider's father called SCI-Somerset to resolve the typewriter issue, an unnamed person who answered the phone falsely claimed an investigator is looking into the situation.[86]

### November 2018—falsified mental health records and other retaliatory conduct including transfer from SCI- Somerset.

On November 2, 2018, Mr. Snider received an order in *Snider I* requiring him to file an amended complaint within seven days. Mr. Snider did not believe he could meet the deadline, so

on November 5, 2018 he moved for an extension of time attaching a declaration from another inmate, Donald Scott, "about the problems with the legal program at SCI- Somerset." The same day some unidentified person at the prison transferred Mr. Scott from the Residential Housing Unit to general population without notice or hearing.[87]

Psychological Services Staff member Alvarez called Mr. Snider to her office.  Ms. Alvarez told Mr. Snider she and others on the staff perceived his ability to help other inmates file grievances as demonstrating his readiness to "move off the block," meaning moving from the Residential Housing Unit to the general population. When Mr. Snider protested a move, Ms. Alvarez responded "we don't need people filing grievances."[88]  Mr. Snider and Ms. Alvarez disagreed with regard to his mental health diagnoses and Ms. Alvarez told him she would arrange for him to be seen by Dr. Sheikh for a second opinion "so [he] could get legal assistance." Ms. Alvarez then falsified Mr. Snider's medical record to make it appear as if he had personality disorder by noting, ". . . Inmate got angry and pounded his fists on the desk and screamed 'How can you help me then?' PSS . . . stated that she could help him with coping skills, and . . . talk to the psychiatrist . . . Inmate laughed at PSS and stated, 'in POC I can bang my head all I want[.]' PSS asked inmate why he bangs his head and inmate stated, '. . . I want help with my legal work.' PSS asked why inmate is taking time away from his goal of getting things done, inmate responded with trying to get assistance with his legal work . . . PSS suggest for inmate to choose himself over others [sic]"[89]

Law Librarian Davis, current education Principal Newmyer, and Ms. Alvarez tricked Mr. Snider into attending a November 13, 2018 meeting.[90] They acted aggressively and angrily and told Mr. Snider his disability did not interfere with his ability to understand legal matters.[91] They based their denial of legal assistance on an inaccurate medical report Ms. Stevens wrote about Mr. Snider.[92] Mr. Snider concludes Ms. Stevens is not a licensed mental health professional and she

"is completely unqualified to comment on whether Mr. Snider has a disability."[93] At the end of the meeting, Ms. Alvarez entered more false information into Mr. Snider's mental health record, noting, "inmate did attempt to manipulate circumstances and get others to say what he wanted them to."[94] Mr. Snider characterizes this entry as "malicious and intended to harm Mr. Snider."[95]

On November 15, 2018, Mr. Snider's attorney in another action visited him but non-party Officer Carr forbid Mr. Snider from bringing his legal materials with him to his meeting with counsel.[96]

On November 17, 2018, Mr. Snider saw Dr. Sheikh for a second opinion. He alleges Ms. Alvarez waited until Dr. Turkal left for vacation to have Mr. Snider evaluated by Dr. Sheikh.[97] Mr. Snider alleges Prison Officials arranged for an examination by Dr. Sheikh and failed to notify Mr. Snider as to the "true reason" for his appointment with Dr. Sheikh.  Mr. Snider alleges he believed Dr. Sheikh planned to "evaluat[e] [him] for legal assistance."[98] During the appointment, Mr. Snider told Dr. Sheikh the information in the mental health record is false, but Dr. Sheikh nevertheless relied on the record to make a diagnosis of personality disorder.[99] Dr. Sheikh did not ask Mr. Snider for his mental health history or about his current symptoms, but she asked him his opinion about his diagnosis.[100]  Dr. Sheikh repeatedly questioned Mr. Snider about his litigation against prison officials and about his criminal appeals.[101] Dr. Sheikh assessed the veracity of Mr. Snider's statements about staff abuse[102] and used her evaluation to diagnose Mr. Snider with anti-social personality disorder and borderline personality disorder.[103] Mr. Snider does not agree with Dr. Sheikh's diagnosis and believes her report to be "malicious, false, and intended to harm . . . his legal claims."[104]

After Dr. Sheikh reported Mr. Snider's diagnosis, Prison Officials notified him there would be a hearing to determine whether he continued to qualify for placement on the Residential

Treatment Unit.[105] Mr. Snider alleges Prison Officials failed to notify Dr. Turkal, his primary mental health care provider, of Dr. Sheikh's second opinion or of staff's attempt to move Mr. Snider from the   Unit.[106] Dr. Turkal opined Dr. Sheikh's diagnosis of personality disorder "inappropriate."[107]

After leaving his evaluation with Dr. Sheikh, Mr. Snider attempted to use the law library to prepare for a hearing to determine a move from the Residential Housing Unit to the general population. Non-party Assistant Law Librarian Becky Gantner refused to allow Mr. Snider to attend his scheduled law library session.[108]

Mr. Snider had a deadline of December 21, 2018 in *Snider I* to file a second amend complaint. Someone approved a transfer from SCI-Somerset to the Union County Prison which has no law library, typewriters, or word processors. The transfer obstructed his ability to use the SCI- Somerset law library. The morning of the transfer non-party Sergeant McCool refused to give him his psychiatric medications.[109]

### III.   Mr. Snider's legal claims.

Mr. Snider's multiple grievances, lawsuits, motions, and appeals admit he knows how to litigate. He admits being a jailhouse lawyer for several other incarcerated persons. True to his grievance strategies, he alleges duplicative facts and attempts to create legal claims. Against these allegations, we find it helpful to specifically outline Mr. Snider's nine causes of action consistent with Rule 8 and given the overlap in several claims and causes of action.[110]   Our responsibility is to cut through the avalanche of grievances to see if he has a legal claim.

Mr. Snider's first claim is retaliation. He sues Law Librarian Davis, former Education Principal Jamison, current Education Principal Newmyer, Deputy Superintendent Caro, Dr. Sheikh, Psychological Staff Support members Alvarez and Stevens, and John Does One, Two,

Three, and Four. He alleges retaliation for his attempted court access, providing basic legal assistance to other inmates, his attempt to exercise his rights under the Americans with Disabilities Act and the Rehabilitation Act, and his attempt to assist other disabled inmates to access the same rights.[111] He claims these Defendants violated the anti-retaliation provision of section 12203 of the Americans with Disabilities Act and his rights under the First, Eighth, and Fourteenth Amendments.

Second, Mr. Snider alleges a supervisory liability claim against Prison Officials Schenck, Weigle, Decker, Alvarez, Stevens, Deputy Superintendent of Facilities Management Caro, Superintendent Tice, and Secretary Wetzel for failing to address, and their acquiescence in, retaliation against him in violation of the anti-retaliation provision of section 12203 of the Americans with Disabilities Act and his rights under the First, Eighth, and Fourteenth Amendments.[112]

Third, Mr. Snider claims Law Librarian Davis, former and current Education Principals Jamison and Newmyer, Deputy Superintendent Caro, Dr. Sheikh, and Psychological Services Staff members Alvarez and Stevens defamed him in violation of the Fifth and Fourteenth Amendments and Pennsylvania law.[113]

Fourth, Mr. Snider claims Law Librarian Davis, former and current Education Principals Jamison and Newmyer, Deputy Superintendent Caro, Dr. Sheikh, and Psychological Services Staff members Alvarez and Stevens "engaged in an official cover-up" of his legal claims  in violation of the anti-retaliation provision of section 12203 of the Americans with Disabilities Act and his rights under the First and Fourteenth Amendments.[114]

Fifth, Mr. Snider alleges Secretary Wetzel, Director of the Pennsylvania Board of Probation and Parole Dunn, Superintendent of SCI- Fayette Mark Capozza, and John Doe Two

maintain a policy and practice of retaliation for attempting court access, frustrating and impeding his meaningful access to court in violation of the anti-retaliation provision of section 12203 of the Americans with Disabilities Act and his rights under the First and Fourteenth Amendments.[115]

Sixth, Mr. Snider claims deliberate indifference to his serious medical need and to future medical needs, as well as failure to protect from self-harm, against Dr. Sheikh and Psychological services staff members Alvarez and Stevens in violation of the Eighth and Fourteenth Amendments.  He additionally alleges their conduct constitutes malpractice and negligence under Pennsylvania law.[116]

Seventh, Mr. Snider claims the Department of Corrections discriminated against him on the basis of his schizophrenia and bi-polar disorder disabilities by excluding him from programs, activities, and services in violation of the Americans with Disabilities Act and the Rehabilitation Act.[117]

Eighth, Mr. Snider alleges the Department of Corrections discriminated against him by "regarding him" as disabled on the basis of an incorrect personality disorder diagnosis in violation of the Americans with Disabilities Act and the Rehabilitation Act.[118]

Finally, Mr. Snider alleges Law Librarian Davis, former and current Education Principals Jamison and Newmyer, and Secretary Wetzel denied him meaningful access to court in violation of his First and Fourteenth Amendment rights.[119]

## IV.   Analysis

The Pennsylvania Department of Corrections and Prison Officials move to dismiss Mr. Snider's amended Complaint for failing to comply with Federal Rule of Civil Procedure 8 and under Federal Rule of Civil Procedure 20 for improperly joining diverse defendants and legally and factually distinct issues in a single lawsuit.[120] Dr. Sheikh moves to dismiss, under Rule

12(b)(6), Mr. Snider's Eighth Amendment deliberate indifference claim, retaliation claim, defamation claim, Americans with Disabilities Act claim, and the medical malpractice claim.[121] Mr. Snider opposes both motions.[122]

Rather than addressing Mr. Snider's claims in the order in which he alleges them, we review his claims by category first addressing his claims of constitutional violations by Prison Officials denying him court access, retaliation, "cover-up," supervisory liability claims, followed by an Eighth Amendment deliberate indifference to medical needs claim, discrimination and retaliation claims under the Americans with Disabilities Act, and, finally, defamation and medical malpractice and negligence claims.

### A.    Mr. Snider states a claim for deliberate indifference against Defendants Alvarez and Stevens but otherwise does not state a claim under federal law.

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint against the pleading requirements of Rule 8(a).  Rule 8(a)(2) requires a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief" "in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."[123] A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[124]

To survive a motion to dismiss, a plaintiff must allege facts "rais[ing] a right to relief above the speculative level . . ." and the complaint "must indicate that a defendant's liability is more than a 'sheer possibility.'"[125] Our Court of Appeals requires us to apply a three-step analysis under a 12(b)(6) motion: we (1) "must 'tak[e] note of the elements [the] plaintiff must plead to state a claim;'" (2) "should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth;'" and, (3) "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an

21

entitlement for relief."[126] "Despite *Iqbal*'s heightened pleading requirements, the district court must be more flexible in its interpretation of *pro se* pleadings."[127]

We may also dismiss Mr. Snider's *in forma pauperis* amended complaint under 28 U.S.C. § 1915(e)(2)(B) if we determine it "(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief."[128]   When considering whether Mr. Snider fails to state a claim under § 1915(e)(2)(b)(ii), we apply the Rule 12(b)(6) standard.[129]

### 1. We dismiss the First and Fourteenth Amendment access-to-court claims.

The heart of Mr. Snider's amended complaint is the denial of his meaningful access to the courts. Putting aside he filed several cases in several courts and represents other incarcerated persons, he alleges Law Librarian Davis, current and former education Principals Jamison and Newmyer, and Secretary Wetzel denied him meaningful access to the courts. He alleges the events at SCI-Somerset are impeding and frustrating his claims in his ongoing PCRA petition and the prosecution of his complaint in *Snider I*.  Mr. Snider argues Prison Officials owe him an affirmative obligation to assist him with preparing and filing meaningful legal papers by providing adequate law libraries or adequate assistance from persons trained in the law. He concedes they provide assistance but not to the level he needs to understand the theories he concocts.

Mr. Snider bases his claims on two Supreme Court decisions, *Bounds v. Smith*[130] and *Lewis v. Casey*.[131]  In *Bounds*, the Supreme Court held "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law."[132]

The Court in *Lewis* made clear the right recognized in *Bounds* is the right of "*access to the courts*" and not "an abstract, freestanding right to a law library or legal assistance."[133] "[P]rison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring 'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.'"[134] "[B]*ounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration."[135]

The Supreme Court identified two general categories of denial-of-access claims. The first is "forward-looking" alleging "systemic official action frustrates a plaintiff . . . in preparing and filing suits at the present time.[136] The second is "backward–looking" claims "not in aid of a class of suits yet to be litigated, but of specific cases that cannot now be tried (or tried with all material evidence), no matter what official action may be in the future. . . . These cases do not look forward to a class of future litigation, but backward to a time when specific litigation ended poorly, or could not have commenced, or could have produced a remedy subsequently unobtainable. The ultimate object of these sorts of access claims, then, is not the judgment in a further lawsuit, but simply the judgment in the access claim itself, in providing relief obtainable in no other suit in the future."[137]

"Where prisoners assert that defendants' actions have inhibited their opportunity to present a past legal claim, they must show (1) that they suffered an 'actual injury'—that they lost a chance to pursue a 'nonfrivolous' or 'arguable' underlying claim; and (2) that they have no other 'remedy that may be awarded as recompense' for the lost claim other than in the present denial of access

suit." [138]  To state a claim for denial of access to the courts, a plaintiff "must allege his efforts to pursue a legal claim were hindered and he suffered an actual injury."[139]

Mr. Snider alleged Prison Officials hindered the prosecution of his claims in *Snider I* and his PCRA challenge in state court. Mr. Snider alleges Grievance Coordinator Schenk limited his phone call with PCRA counsel to fifteen minutes, his witness Mr. Harvey did not testify in his PCRA case for fear of retaliation, Law Librarian Davis denied him legal assistance and extra time in the law library to prosecute his claims in *Snider I*, a two-week prison wide lockdown deprived him of the law library, a piece of mail in *Snider I* came to him cut in half, and we dismissed his claims against the United States and the United States District Court for the Middle District of Pennsylvania in *Snider v. United States,* No. 18-1789, because Law Librarian Davis, Principal Jamison and "other PA DOC officials" denied him legal assistance.

"Inmates enjoy a First Amendment right to reasonable telephone access" but they do not have a "right to unlimited telephone use and reasonable restrictions on telephone privileges do not violate their First Amendment rights."[140] An inmate's "right to telephone access is 'subject to rational limitations in the face of legitimate security interests of the penal institution.'"[141] To determine whether Mr. Snider states a claim for the deprivation of his First Amendment right, we must consider: "(1) whether [he] has alleged facts giving rise to an inference that no legitimate penological interest was served by...[d]efendants' actions, (2) whether he has sufficiently alleged that . . . [d]efendants' actions caused him an 'actual injury,' and (3) whether he had alternative avenues through which he could communicate with his attorneys and the courts' . . .."[142]  Mr. Snider fails to allege facts to sufficiently support of these factors. We dismiss his First Amendment claim to the extent it is based on limitations of telephone use.

Likewise, incarcerated persons have a First Amendment right to use of the mail.[143] Mr. Snider alleges interference with his mail on two occasions: in February 2018, he received a piece of mail in *Snider I* that had been cut in half[144] and in September 2018, the Department of Corrections "repeatedly" rejected receipt of mail from Mr. Snider's father and instead sent to another inmate's family.[145] Mr. Snider does not allege how the damaged piece of mail in *Snider I* or refused mail from his father caused actual injury. To the extent he alleges a deprivation of court access based on the refusal of his father's mail, "such a claim must relate to either a direct or collateral challenge to [his] sentence or conditions of confinement" and there is no allegation his father's mail to him did so.[146]

In his opposition to the Motions to dismiss, Mr. Snider argues because Prison Officials did not ensure his meaningful access to court while at SCI-Somerset, "he made the mistake of filing multiple new cases" making his "legal claims exponentially more complex and has opened the door for him to falsely be accused of being a malicious and burdensome litigant."[147] Mr. Snider alleges the denial of meaningful access to the courts "has and will cause irreparable injury" to his legal claims in *Snider I* and his PCRA action.

But Mr. Snider does not plead actual injury. He does not plead a lost chance to pursue a nonfrivolous or arguable underlying claim and no other "remedy that may be awarded as recompense" for the lost claim other than in the present denial-of-access claim. Both *Snider I* and his PCRA action are currently pending. Mr. Snider is represented by counsel in his PCRA appeal recently disposed of by the Pennsylvania Superior Court, and within the time period for appeal to the Pennsylvania Supreme Court.[148] His alleged "mistake" in filing "multiple new cases" is not an allegation of lost claims; to the contrary, it evidences access to the courts. In addition to *Snider I* and his PCRA case before the Pennsylvania Superior Court, Mr. Snider currently maintains two

cases pending before Pennsylvania's Commonwealth Court in *Snider v. Union County*, No. 717 CD 2020 and *Snider v. Pennsylvania Department of Corrections*, 470 MD 2020 and cases in the United States District Court for the Western District of Pennsylvania in *Snider v. Wittig*, No. 18-703 and *Snider v. Gilmore*, No. 18-735. Mr. Snider currently maintains seven appeals in our Court of Appeals from various rulings in this case, *Snider I*, another matter *Snider v. Corbett*, No. 13-1226,[149] and his cases in the Western District of Pennsylvania.

To the extent Mr. Snider alleges the dismissal of his claims against the United States, the United States District Court for the Middle District of Pennsylvania, and former acting Attorney General Matthew Whitaker in *Snider I* is lost because of Defendants' alleged conduct in denying him access to the courts, he must point to a "nonfrivolous, arguable, underlying claim." We dismissed Mr. Snider's claims against the United States, the District Court, and the former acting Attorney General after he moved to withdraw those claims.[150]

Failing to plead actual injury, we dismiss Mr. Snider's First Amendment access-to-court claims. Mr. Snider does not and cannot plead actual injury caused by lost access to court. His post-conviction petition and his *Snider I* case are proceeding. We dismiss his access-to-court claims. He has access. He is a prolific litigant in several courts. He just wants a higher level of legal assistance while incarcerated. The Constitution does not require the state to provide the highest level of law assistance to incarcerated persons.

### 2. We dismiss the First Amendment retaliation claims failing to plead an adverse action for some alleged retaliatory conduct causing him harm and Defendants' personal involvement.

Mr. Snider claims Law Librarian Davis, former Education Principal Jamison, current Education Principal Newmyer, Deputy Superintendent Caro, Dr. Sheikh, Psychological Staff Support members Alvarez and Stevens, and John Does One, Two, Three, and Four retaliated

against him for his attempted court access and providing basic legal assistance to other inmates.[151] He alleges the retaliation violates his civil rights under the First, Eighth, and Fourteenth Amendments.[152] In his opposition to Defendants' Motions to dismiss, Mr. Snider argues retaliatory conduct began after he attempted to "access court *pro se*"; attempted to obtain and present evidence and witness testimony in his PCRA case pending in state court; asked Prison Officials "to ensure his meaningful access to court" in the form of legal assistance to prosecute his claims in *Snider I* including legal assistance in drafting his pleadings; and filed a grievance after being denied legal assistance in *Snider I* by Law Librarian Davis.[153]

To state a First Amendment retaliation claim, Mr. Snider must allege "(1) constitutionally protected conduct, (2) an adverse action by prison officials sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the exercise of his constitutional rights and the adverse action taken against him."[154]

Mr. Snider brings his First Amendment retaliation claims against Law Librarian Davis, former Education Principal Jamison, current Education Principal Newmyer, Deputy Superintendent Caro, Dr. Sheikh, Psychological Staff Support members Alvarez and Stevens, and John Does One, Two, Three, and Four in their individual and official capacities.[155] Mr. Snider's claims against these Defendants in their official capacities are barred by sovereign immunity.[156] A lawsuit against a state official in his or her official capacity is a suit against his or her office and cannot proceed under section 1983.[157] We dismiss the official capacity claims with prejudice.

Mr. Snider may seek to hold these Defendants liable in their individual capacities. For personal liability to attach to these Defendants on a constitutional retaliation theory under section 1983, Mr. Snider must allege personal involvement in the conduct.[158] "Personal involvement can

27

be shown through allegations of personal direction or of actual knowledge and acquiescence" and "must be made with appropriate particularity."[159]

We first analyze whether Mr. Snider states a First Amendment retaliation claim and then determine whether he alleges facts sufficient to hold these Defendants liable in their personal capacity.

### *Does Mr. Snider state a claim for First Amendment retaliation?*

We dismiss Mr. Snider's First Amendment retaliation claim based on his attempt to provide legal assistance to other inmates. As a matter of law, there is no constitutionally protected right to provide legal assistance to another inmate.[160] Mr. Snider's filing of his own grievances and lawsuits is constitutionally protected activity.[161] Narrowing First Amendment retaliation to his grievances and lawsuits, we analyze the other elements of a retaliation claim.

The second element of a retaliation claim under the First Amendment is adverse action. Mr. Snider alleges a laundry list of adverse actions taken by Prison Officials in retaliation for his protected activity: harassment and intimidation; falsification of mental health records; threatening to fire him from his job; retaliatory transfer away from friends; intentionally confusing him and "fabricat[ing] evidence against him"; holding his legal papers in front of his face and harassing him; theft of his legal book; refusal to provide him with purchases from the commissary; causing his video conference equipment to malfunction while participating in court proceedings; refusing to allow him to meet with counsel; restricting his phone communication with counsel to fifteen minutes; refusing to allow pre-approved legal materials into a pre-approved legal visit with counsel; impeding his mail; refusing to protect him from harassment and retaliation; separation from other inmates who are witnesses in his court actions; turning off his cable television for two weeks; denial of psychiatric medication; and, destroying his typewriter.[162]

Adverse action by prison officials must be "sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights."[163] This is ordinarily a fact question for the jury, but some alleged "'adverse actions' are so *de minimis* that they fail to state a retaliation claim as a matter of law."[164] In the prison context, our Court of Appeals finds "the following actions . . . sufficient to establish adversity: several months in disciplinary confinement; denial of parole, financial penalties, and transfer to an institution whose distance made regular family visits impossible; and placement in administrative segregation that severely limited access to the commissary, library, recreation, and rehabilitative programs."[165]

Verbal threats and harassment are not sufficiently adverse to state a claim for First Amendment retaliation.[166] We construe his argument Prison Officials "intentionally confused" him by requiring him to file a request for his mental health file as a form of harassment to the extent it is even pleaded.[167] We dismiss the retaliation claim based on allegations of threats and harassment.

At the motion to dismiss stage, at least one district court found allegations of falsified medical records an adverse action as it "could plausibly deter a plaintiff of ordinary firmness from filing a grievance because doing so would protect a defendant from subsequent allegations of insufficient medical care, leaving the injured plaintiff without a remedy."[168] In *Jordan*, plaintiff alleged corrections officers beat him and then failed to document the medical record with his injuries in retaliation for filing a grievance regarding the beating. In another case, a district court found an allegation of falsified medical records an insufficient adverse action.[169] In *Whitenight*, plaintiff alleged defendants falsified medical records by hiding an MRI report. The district court found plaintiff's allegations of "falsified records" amounted to a disagreement about a physician's assessment of plaintiff's physical capabilities and "cannot be said to constitute an adverse action

for purposes of a retaliation claim."[170] Mr. Snider's allegation is similar to *Whitenight*; he disagrees with the notations of Psychological Services Staff members Alvarez and Stevens in the medical record suggesting a personality disorder and disagrees with Dr. Sheikh's diagnosis of a personality disorder. But he does not allege adverse action based on the alleged false diagnosis of personality disorder. Mr. Snider does not agree with Dr. Sheikh's diagnosis and believes her report to be "malicious, false, and intended to harm . . . his legal claims" but there are no plausible allegations the alleged "false diagnosis" would deter a person or ordinary firmness from filing a grievance. We dismiss the retaliation claim based on alleged falsified medical records against Dr. Sheikh and Psychological Services Staff members Alvarez and Stevens.

The remaining alleged adverse actions do not meet the level of adverse action defined by our Court of Appeals in *Dunbar*: transfer from one side of the residential housing unit to the other, transfer to the Union County jail, and separation from inmate witnesses;[171] theft of his legal book by John Doe One;[172] damage to his typewriter;[173] restricting time limits on telephone communication with counsel, including refusing to allow him to bring pre-approved legal materials to a pre-approved visit with counsel, turning counsel away from a visit, and causing a video and audio feed for a court appearance in *Snider I* by John Doe Three;[174] impeding mail;[175] and, turning off his cable-TV for two weeks.[176] None of these acts rise to the level of adverse action found by our Court of Appeals. They represent a series of grievances typical in a prison. We cannot hold these types of acts are adverse action for purposes of a retaliation claim.[177]

We face a closer call on the decision by some unidentified person in October 2018 to abruptly stop his psychiatric medication for five days and in December 2018, non-party Sergeant McCool refused to give him his medication.[178] The denial of medicine to a man widely known to need medicine for mental health is like restricting access to services. The denial of medicine is at

least plausibly sufficient to deter a person of ordinary firmness from exercising his constitutional rights.

At the third prong of a First Amendment retaliation claim, Mr. Snider must allege a causal link between the exercise of his constitutional rights and the adverse action taken against him. To plead a causal link, Mr. Snider must allege either: "(1) an unusually suggestive time proximity between the protected activity and the allegedly retaliatory action; or (2) a pattern of antagonism coupled with timing to establish a causal link."[179] While temporal proximity is often important to establish retaliation, "the mere passage of time is not legally conclusive proof against retaliation"[180] if the prisoner can "establish[] a nexus."[181] Our Court of Appeals considered a court's obligation to liberally construe a *pro se* litigant's complaint and concluded "the word 'retaliation' . . . sufficiently implies a causal link between [Mr. Snider's] complaints and the misconduct charges filed against him."[182]

Mr. Snider alleges after he filed his first grievance in February 2018, Prison Officials began to retaliate against him. His only possible claim of adverse action arises in October and November 2018 when an unidentified person and a non-party denied or delayed him medicine. At this stage, Mr. Snider sufficiently pleads his ongoing grievances and lawsuits motivated the denial or delay of his psychiatric medication in October and November 2018.

### *Does Mr. Snider allege personal involvement of the Defendants sufficient to state a claim in their personal capacities?*

Even if Mr. Snider alleges an adverse action relating to the denial or delay of medicine in October and November 2018 by an unknown person and a non-party, he must sufficiently allege the individual Defendants' personal involvement. We now examine whether Mr. Snider alleges each of the individual Defendants' personal involvement in the complained-of retaliation sufficient

to hold them personally liable. Again, personal involvement requires particular "allegations of personal direction or of actual knowledge and acquiescence."[183]

Mr. Snider alleges denial or delay of psychiatric medicine on two occasions: on one occasion in October 2018 some unidentified person "abruptly stopped" his psychiatric medication for five days; and in December 2018, non-party Sergeant McCool refused to give him his medication.[184] There are no allegations of Defendants' personal involvement.

Even if Mr. Snider plausibly alleges some adverse action, he fails to allege personal involvement of Defendants sufficient to hold them personally liable under section 1983.[185] We dismiss his First Amendment retaliation.

### 3. We dismiss the "cover-up" claim.

Mr. Snider claims Law Librarian Davis, former and current education Principals Jamison and Newmyer, Deputy Superintendent Caro, Dr. Sheikh, and Psychological Services Staff members Alvarez and Stevens "engaged in an official cover-up" of his legal claims in violation of his First and Fourteenth Amendment rights as well as the anti-retaliation provisions of the Americans with Disabilities Act.[186] In his opposition to Defendants' motions to dismiss, Mr. Snider explains the Defendants fabricated evidence to cover-up his legal claims and to cover-up their misconduct and the misconduct of others including the Department of Corrections and its officials and "discriminated and interfered" with his legal claims, including his Americans with Disabilities Act claims, to injure his claims.[187]

Mr. Snider does not allege the legal authority basis of his "cover-up" claim. He cites *Christopher v. Harbury* for the proposition "officials acts" such as "conspiracies to destroy or cover-up evidence of a crime that render a plaintiff's judicial remedies inadequate or ineffective

violat[e] the right of access."[188] *Christopher* is inapplicable and does not support Mr. Snider's "cover-up" theory.

In *Christopher*, the American widow of a Guatemalan rebel leader executed by Guatemalan officers affiliated with the CIA sued the CIA, the State Department, the National Security Council, and members of each in their official and individual capacities. The widow alleged State Department officials deceived her by making representations about her husband's fate, even after it knew of her husband's death, and continued to convey the impression the State Department knew nothing definitive about her husband but sought "concrete information" and would keep her informed.[189] The widow alleged the State Department knew all along of her husband's execution, but engaged in misleading statements and omissions because it did not want its complicity in her husband's death revealed.

The widow brought multiple claims against the federal defendants including a First and Fifth Amendment claim alleging deceptive statements and omissions by the State Department and National Security Council unconstitutionally impeded her access to courts, her rights to speak freely and to petition the government. The widow based her access-to-courts claim on the theory if officials told her what they knew about her husband's fate or declined to comment rather than affirmatively misleading her into thinking officials were doing something to locate her husband, "she might have been able to take appropriate actions to save her husband's life."[190] The widow alleged the deception foreclosed her ability to effectively seek adequate legal redress.

The district court dismissed the access-to-court claim. It recognized while some courts of appeals "have held that conspiracies to destroy or cover-up evidence of a crime that render a plaintiff's judicial remedies inadequate or ineffective violat[e] the right of access," the widow did

not state a valid cause of action.[191] Mr. Snider seizes on this language. But the access-to-court claim in *Christopher* ultimately failed.

The Court explained "[w]hether an access claim turns on a litigating opportunity yet to be gained or an opportunity already lost, the very point of recognizing any access claim is to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong. However unsettled the basis of the constitutional right of access to courts, our cases rest on the recognition that the right is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court."[192] The Court held "the underlying cause of action, whether anticipated or lost, is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation. It follows, too, that when the access claim (like this one) looks backward, the complaint must identify a remedy that may be awarded as recompense but not otherwise available in some suit that may yet be brought. There is, after all, no point in spending time and money to establish the facts constituting denial of access when a plaintiff would end up just as well off after litigating a simpler case without the denial-of-access element."[193]

Even if we accepted Mr. Snider's allegation of some undefined "cover-up," he fails to allege a claim or "litigating opportunity" he lost. To the contrary, Mr. Snider is challenging his underlying criminal conviction in state court and is actively litigating in this action, *Snider I*, and in the Western District of Pennsylvania.

To the extent Mr. Snider intended to bring a conspiracy claim under 42 U.S.C. §§ 1983 and 1985, it also fails. To state a claim for conspiracy under section 1983, a plaintiff must allege "persons acting under color of state law reached an understanding to deprive him of his constitutional rights."[194] This requires "state actors took 'concerted action' based on an

'agreement' to deprive the plaintiff of his constitutional rights, and that there was an actual underlying constitutional violation of the plaintiff's rights."[195] Mr. Snider fails to allege an agreement. Even if he alleged an agreement among the Defendants to deprive him of his constitutional right to access-to-court, as analyzed above there is no such deprivation as alleged. Having failed to plausibly allege a violation of his right to access-to-court, a claim for conspiracy to violate the right fails.[196]

To state a conspiracy claim under section 1985(3), Mr. Snider must allege: (1) a conspiracy; (2) motivated by a racial or class based discriminatory animus designed to deprive, directly or indirectly, any person or class of persons to the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or the deprivation of any right or privilege of a citizen of the United States.[197] Mr. Snider fails to sufficiently allege any of these elements, including Defendants being motivated by a racial or class-based discriminatory animus to deprive him of equal protection of the law.[198] Any claim under section 1985(3) fails. We dismiss Mr. Snider's "cover-up" claim.

### 4. We dismiss the supervisory liability claim.

Mr. Snider claims Grievance Coordinator Schenck, Mailroom Supervisor Weigle, Business Manager Decker, Psychological Services Staff members Alvarez and Stevens, Deputy Superintendent Caro, Superintendent Tice, and Secretary Wetzel failed to address "repeated retaliation" and are liable under a supervisory liability theory.[199] Mr. Snider claims their failure to address, and their acquiescence in, repeated retaliatory conduct against him violates his First, Eighth, and Fourteenth Amendment rights and the anti-retaliation and anti-coercion provisions of section 12203 of the Americans with Disabilities Act.

Section 1983 provides a cause of action against "every person who, under color of state [law], . . . subjects, or causes to be subjected, . . . [another] person . . . to the deprivation of any" federally protected right.[200] Under a section 1983 supervisory liability theory, supervisors may be liable for the alleged violation of a plaintiff's constitutional rights by condoning or acquiescing in a subordinate's violation of those rights. But liability cannot be based on *respondeat superior*; state actors are liable only for their own unconstitutional conduct.[201]

Our Court of Appeals recognizes two theories for establishing supervisory liability under section 1983: "(1) when the supervisor, with deliberate indifference to the consequences, 'established and maintained a policy, practice or custom which directly caused [the] harm;' or (2) when the supervisor 'participated in violating the plaintiff's rights, directed others to violate them, or as the person in charge, had knowledge of and acquiesced in his subordinates' violations.'"[202]

Because Mr. Snider failed to plead a constitutional violation based on retaliation, there can be no supervisory liability claim.[203] Mr. Snider also fails to allege supervisor involvement or deliberate indifference to his Eighth Amendment claim. Discovery may allow Mr. Snider to plead supervisory liability on this claim.

### 5. We dismiss supervisory liability claims against Secretary Wetzel, Director of the Pennsylvania Board of Probation and Parole, Superintendent of SCI-Fayette, and John Doe Two.

Mr. Snider alleges Secretary Wetzel, the Director of the Pennsylvania Board of Probation and Parole Dunn, Superintendent of SCI-Fayette Capozza, and John Doe Two engaged in or maintained a policy and practice of retaliation for attempted court access which is impeding and frustrating his meaningful access to the courts in violation of his civil rights and the Americans with Disabilities Act.[204] Mr. Snider sues these Defendants in their individual and official capacities.

In response to Defendants' motions to dismiss, Mr. Snider focuses on the alleged intimidation of another inmate, Lennie Harvey, whom Mr. Snider intended to be a witness in his PCRA action.[205] Mr. Harvey's alleged intimidation allegedly occurred at SCI-Fayette. Mr. Snider argues this is the policy of retaliation as maintained by these Defendants.

To hold these Defendants individually liable Mr. Snider must, as analyzed in the supervisory liability analysis above, allege personal involvement of Secretary Wetzel, Director Dunn, Superintendent Capozza, and John Doe Two. He must allege these Defendants, as supervisors, (1) "acted with deliberate indifference to the consequences, 'established and maintained a policy, practice or custom which directly caused [the] harm;' or (2) when the supervisor 'participated in violating the plaintiff's rights, directed others to violate them, or as the person in charge, had knowledge of and acquiesced in his subordinates' violations."

Mr. Snider alleges an unknown person made Secretary Wetzel "aware" of alleged conduct in failing to put his mental health records in his Department of Corrections file.[206] It is unclear whether this allegation has any relation to the alleged retaliation policy. Mr. Snider alleges Mr. Harvey's intimidation "may have occurred" as a result of the "well established practice" of retaliation in the Department of Corrections maintained by Secretary Wetzel, Director Dunn, and Superintendent of FCI-Fayette Capozza.[207] Aside from this bald allegation, Mr. Snider fails to allege facts sufficient to at least plausibly allege these Defendants, acting with deliberate indifference, established and maintained a policy directly causing Mr. Snider harm. Mr. Snider similarly alleges Mr. Harvey's intimidation, alleged to be part of the retaliation policy, "could have been caused by threats to him by John Doe Two."[208] To the extent John Doe Two is a supervisor, and there is no allegation he/she is a supervisor, the allegations John Doe Two "could have" threatened Mr. Harvey is not sufficient to state a plausible claim.

In addition to an alleged policy of retaliation, Mr. Snider alleges the Department of Corrections has a policy and practice of "(a) considering personality disorders to be untreatable not warranting disability accommodations or therapy; (b) entering false information into inmate mental health records to make diagnosis of personality disorders appear justified in order to avoid providing treatment medications or disability accommodations to inmates who have schizophrenia, bi-polar disorder, PTSD, depression, etc. and in order to hide and eclipse those legitimate diagnosis; (c) entering false information into inmate mental health records of inmates who attempt use of the grievance procedure and civil litigation or who attempt to present a mental health defense in their criminal case or appeal. This is done to make personality disorder diagnosis appear justified with the intention of covering up the legal claims of those inmates; (d) treating inmates regarded as having personality disorder in harsh, disrespectful and prejudicial ways and using such diagnosis to justify exclusion from programs, activities and services and to make placement into solitary confinement appear justified."[209]

To the extent Mr. Snider is attempting to bring a claim against these Defendants in their official capacity for the Department of Corrections under *Monell v. Department of Social Services of the City of New York*,[210] this claim fails as a matter of law. Under a *Monell* theory of liability, a municipality is only liable under § 1983 for constitutional violations that are caused by its official policies and customs.[211] The Commonwealth of Pennsylvania, however, is immune from liability.[212] The "Commonwealth of Pennsylvania's Department of Corrections is a part of the executive department of the Commonwealth, . . . it shares in the Commonwealth's Eleventh Amendment immunity."[213] "The Commonwealth of Pennsylvania has not waived its Eleventh Amendment immunity" and we dismiss any intended *Monell* claim against the Department of Corrections.[214]

**6.   We dismiss the Eighth Amendment deliberate indifference claim except as to Psychological Staff members Alvarez and Stevens in failing to provide therapy and treatment.**

Mr. Snider alleges Psychological Staff Services members Alvarez and Stevens and Dr. Sheikh were deliberately indifferent to his serious medical need and his serious future medical needs as well as their failure to protect him from self-harm in violation of the Eighth and Fourteenth Amendments.[215]

"The Eighth Amendment, through its prohibition on cruel and unusual punishment, prohibits the imposition of 'unnecessary and wanton infliction of pain contrary to contemporary standards of decency.'"[216] Prison officials violate the Eighth Amendment "when they act deliberately indifferent to a prisoner's serious medical needs by 'intentionally denying or delaying access to medical care or interfering with the treatment once prescribed.'"[217] To state an Eighth Amendment claim, "a plaintiff must make (1) a subjective showing that 'the defendants were deliberately indifferent to [his] medical needs' and (2) an objective showing that 'those needs were serious.'"[218]

Mr. Snider alleges he carries diagnoses of schizophrenia, including schizophrenia of the paranoid type, depressed type, bi-polar type, and schizoaffective disorder; depression and major affective disorder depression with severe psychotic features; post-traumatic stress disorder; and bi-polar disorder.  He is prescribed medication for the treatment of these conditions. "A medical need qualifies as 'serious' for purposes of Eighth Amendment analysis if, for example, 'it is one that has been diagnosed by a physician as requiring treatment.'"[219] "A mental illness may constitute a serious medical need."[220] Mr. Snider's mental health diagnoses meet the objective standard of a serious medical need.

Having met the objective prong of an Eighth Amendment claim, we examine whether Mr. Snider alleges deliberate indifference. This is a subjective inquiry. "Deliberate indifference" may be shown "where, for example, 'prison authorities deny reasonable requests for medical treatment . . . and such denial exposes the inmate to undue suffering.'"[221] "Alternatively, 'deliberate indifference' is shown 'where knowledge of the need for medical care [is accompanied by the] . . . intentional refusal to provide that care' or where 'prison authorities prevent an inmate from receiving recommended treatment for serious medical needs or deny access to [a] physician capable of evaluating the need for such treatment.'"[222]

Our Court of Appeals makes a distinction "between cases where the complaint alleges a complete denial of medical care and those alleging inadequate medical treatment."[223] "Because 'mere disagreement as to the proper medical treatment' does not 'support a claim of an eighth amendment violation,'. . . when medical care is provided, we presume that the treatment of a prisoner is proper absent evidence that it violates professional standards of care."[224]

### Deliberate indifference based on "hiding" diagnoses and falsifying diagnoses.

Mr. Snider explains his Eighth Amendment claim is based on the conduct of Ms. Alvarez, Ms. Stevens, and Dr. Sheikh in "hid[ing] [his] symptoms and declining mental health, and to ensure painful treatment perhaps for decades in the future or for the rest of [his] life."[225] He argues these defendants "hid" his declining mental health from his primary mental health provider, Dr. Turkal "without proper intervention," he became severely ill and engaged in self-injury, and their "false reporting maintained a 'hostile environment.'"[226]

Mr. Snider's Eighth Amendment claim is not sufficiently pleaded as to most of his claims. He judicially admits care. He alleges Ms. Alvarez, Ms. Stevens, and Dr. Sheikh "hid" what he believes is his accurate diagnosis in favor of a fabricated diagnosis. There are no allegations of

delayed or denied treatment as a result of the "hidden" diagnosis. To the contrary, he alleges Dr. Turkal—his preferred mental health provider—examined him twice during the time of the alleged scheme to hide his true diagnosis in favor of a fabricated personality disorder diagnosis.  He alleges Dr. Turkal examined him on April 25, 2018 in an "urgent non-scheduled evaluation."[227] Dr. Turkal noted Mr. Snider's report of acute panic attack, reported him as tearful and sobbing with difficulty calming and refocusing, "out of control" mood and anxiety, and difficulty communicating. Dr. Turkal noted his diagnosis of bi-polar disorder with psychotic features and changed his medication and prescribed new medication.[228] Mr. Snider alleges Dr. Turkal noted Dr. Sheikh "made some clear mistakes" when Dr. Sheikh examined him on March 1, 2018 by raising one of his medications and by not scheduling a follow-up appointment causing him to go unmonitored for three months.[229]

The allegation of a three-month lack of care is belied by the timing of the alleged visits— March 1, 2018 and April 24, 2018. This allegation is also contrary to Mr. Snider's allegation Defendants "hid" his diagnosis from Dr. Turkal because she noted his bi-polar diagnosis and could not have been "hidden" from her. Less than two months later, Mr. Snider again met with Dr. Turkal who interviewed him about his mental health history and put medical records from Torrance State Hospital and a court-ordered (presumably state court ordered in the underlying criminal action) mental health evaluation in his Department of Corrections mental health file.[230] Based on her examination, Dr. Turkal concluded Mr. Snider did not meet the criteria for personality disorder, removed the diagnosis from his file, and raised his medication dosage.[231] By his own allegations, Dr. Turkal examined Mr. Snider, including taking a mental health history, and reviewed other mental health records. It is not plausible Defendants Alvarez, Stevens, and Dr. Sheikh somehow "hid" information from Dr. Turkal who examined him on two occasions.

Mr. Snider alleges "psychiatry" saw him between October 29, 2018 and November 2, 2018.[232] He does not allege denial or delay of treatment or an otherwise deliberate indifference to his serious medical needs. On November 2, 2018, Mr. Snider received an order in *Snider I* which upset him and he began banging his head against the wall causing injury. He alleges medical staff attended to his head injury.[233]

To the extent Mr. Snider bases his Eighth Amendment claim on "hiding" some diagnoses and fabricating another diagnosis, it is dismissed.

### Deliberate indifference based on allegations of denied therapy or counseling.

At various points, Mr. Snider alleges Ms. Alvarez and Ms. Stevens "failed to organize therapy or counseling" after he reported his anxieties about interacting with "prison officials and mental health officials" and judges in *Snider I*.[234] Accepting Mr. Snider's allegations as true, as we must at this stage, Psychiatric Services Staff members Alvarez and Stevens, who appear to have had frequent interaction with Mr. Snider and familiarity with his mental health diagnoses, denied him therapy or counseling after he reported anxiety. We will allow Mr. Snider's Eighth Amendment claim to go forward based on these narrow allegations of denied treatment.

### Deliberate indifference based on denial of medication.

As we described in our analysis of his First Amendment retaliation claim in finding adverse action in the denial or delay of medicines in October and November 2018, we similarly find the complete denial of care could constitute deliberate indifference. But Mr. Snider does not sue the persons who allegedly deprived him of these medicines. He also pleads no basis for supervisory liability of the persons who allegedly deprived him of these medicines in October and December 2018. We must dismiss this Eighth Amendment claim but allow Mr. Snider, through discovery, to amend his allegations if he can identify the persons who denied him medicines.

### 7.   We dismiss the disability discrimination and retaliation claims.

Mr. Snider claims the Department of Corrections discriminated against him because of his schizophrenia or bipolar disorder and excluded him from programs, activities, and services in violation of Title II of the Americans with Disabilities Act and Rehabilitation Act.[235] He additionally alleges Law Librarian Davis, former and current Education Principals Jamison and Newmyer, Deputy Superintendent Caro, Dr. Sheikh, Psychological Services Staff members Alvarez and Stevens retaliated against him for, *inter alia*, requesting reasonable accommodations for legal assistance and helping other disabled inmates with their grievances. We address each in turn.

#### *We dismiss disability discrimination claims.*

"Title II of the [Americans with Disabilities Act] prohibits discrimination against the disabled in public services, programs, and activities."[236] Section 12132 of Title II provides "[n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[237]

"The term 'qualified individual with a disability' means an individual with a disability who, **with or without reasonable modifications to rules, policies, or practices,** the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."[238] To assure the requirements of section 12132 are met, "'reasonable accommodation' may have to be provided to the qualified individual."[239] Mr. Snider may assert a failure to accommodate as an independent basis for liability under the Americans with Disabilities Act and the Rehabilitation Act by alleging "the

accommodation he seeks is reasonable . . . *i.e.* that it is 'necessary to avoid discrimination on the basis of disability.'"[240]

To state a claim for disability discrimination under either the Americans with Disabilities Act or Rehabilitation Act, Mr. Snider must allege he: (1) is a qualified individual with a disability, (2) "who was precluded from participating in a program, service, or activity, or otherwise was subject to discrimination"; (3) "by reason of his disability."[241] "A plaintiff who shows he was 'otherwise discriminated against' but not 'excluded' by a public entity makes out a prima facie case of discrimination under Title II."[242]

Where, as here, a plaintiff seeks compensatory damages, Mr. Snider must also allege "intentional discrimination under a deliberate indifference standard."[243] To show deliberate indifference, Mr. Snider must allege (1) the Department of Corrections had "knowledge that a federally protected right is substantially likely to be violated," and (2) the Department of Corrections failed "to act despite that knowledge."[244]

Mr. Snider alleges the Department of Corrections "has discriminated against [him] by reason of his schizophrenia or bi-polar disorder ***and*** has excluded him from programs, activities and services."[245] He also alleges in various paragraphs Prison Officials failed to provide him unspecified accommodations.[246] Applying the most liberal reading of his amended complaint, we construe his allegations as the Department of Corrections (a) excluded him from programs, activities, and services by reason of his schizophrenia or bi-polar disorder, (b) otherwise discriminated against him by reason of his disability, and (c) failed to accommodate his schizophrenia or bi-polar disorder.

We accept as true Mr. Snider's allegation he is disabled by his schizophrenia and bi-polar I disorder, satisfying the first element of a Title II discrimination claim.

The second element requires an allegation of a program, service, or activity from which the Department of Corrections excluded Mr. Snider. "Our Court has made clear that the phrase 'service, program, or activity' is extremely broad in scope and includes 'anything a public entity does.'"[247]  Title II's regulations prohibit discrimination based on disability: "A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability - . . . (ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service *that is not equal to that afforded others*; (iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach *the same level of achievement as that provided to others*; (iv) Provide *different or separate aids, benefits, or services to individuals with disabilities* or to any class of individuals with disabilities *than is provided to others* unless such action is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others; . . . (vii) Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity *enjoyed by others* receiving the aid, benefit, or service."[248]

We read Mr. Snider's amended complaint and brief in opposition to the motions to dismiss to allege the Department of Corrections refused him "legal support meaning that officials did not provide [him] with any methodologies to help him understand how to proceed, did not give him legal assistance or assist him to draft his pleadings, and when he appeal the denial by filing [a] grievance . . . Librarian Davis and Principal Jamison threatened to fire him from his job[,] attempted to confuse him and told him to withdraw the grievance."[249]

He alleges at a February 28, 2018 status conference with the court in *Snider I*, Prison Officials failed to provide him with a disability accommodation.[250] He does not allege the accommodation he sought. He alleges at the time of the February 28, 2018 status conference, the entire prison had been in a two-week lockdown, including the law library, and alleges he should have been given an accommodation to address his mental health issues caused by prison-wide lockdown and closure of the law library.[251]

Mr. Snider does not allege the Department of Corrections has a service or program providing legal assistance to other, non-disabled inmates. And this is the "fatal defect" in his Title II claim.[252]

It is possible Mr. Snider is challenging the Department of Corrections' "Access to Provided Legal Services" policy DC-ADM 007. The Policy provides legal assistance to an inmate who, *inter alia*, has "a disability that substantially interferes with his/her ability to use or understand legal materials." Mr. Snider alleges he asked for legal assistance in *Snider I* under the Policy which Law Librarian Davis denied, and he filed a grievance.[253] He alleges Law Librarian Davis denied requests for legal assistance to prepare his pleadings in *Snider I* because he did not qualify for legal assistance under the Department's Policy and "she had to follow" the Policy.[254] This is not an allegation of exclusion of services afforded to others based on disability; this is a dispute over Mr. Snider's eligibility for legal assistance under the Policy extended to assist disabled inmates.

Mr. Snider additionally alleges general problems with the law library at SCI-Somerset.[255] A prison law library is a "service" and "the use of it an 'activity'" for purposes of Title II.[256] In one instance, Mr. Snider alleges Law Librarian Davis denied him extra time in the law library.[257] He does not allege she denied him access because of his alleged disability. He alleges generally there are not enough computers in the law library and, while there is enough time for library access,

when he is experiencing mental health issues, he "finds it unusually difficult to accomplish meaningful research or type documents within the time provided."[258] He does not allege he is excluded from the law library or denied access because of his disability.

Mr. Snider fails to allege the programs, activities, and services at SCI-Somerset from which the Department of Corrections excluded him. He does not allege how the Department of Corrections denied him access to prison activities, programming, and services to which he would otherwise be entitled but for his disability. We dismiss Mr. Snider's Americans with Disabilities Act and Rehabilitation Act claims based on the denial of "legal assistance."

Moving to an "otherwise subject to discrimination" theory, Mr. Snider fails to allege how the Department of Corrections discriminated against him by reason of his schizophrenia or bi-polar disorder. There are no allegations of disparate treatment by the Department of Corrections from non-disabled inmates.

On a failure to provide reasonable accommodation, Mr. Snider fails to allege the reasonable accommodations to ensure access to prison services and programming. Instead, Mr. Snider alleges because he is disabled the Department of Corrections must provide him with legal assistance to prosecute his claims in *Snider I* and his PCRA case and failed to accommodate him for his February 28, 2018 status conference in *Snider I*. But litigation is not a program, service, or activity of the Department of Corrections. We infer from his allegations a two-week prison-wide lockdown beginning February 14, 2018 caused his mental health to deteriorate and kept the law library closed which presumably denied his meaningful participation in the February 28, 2018 status call.[259] But there is no allegation the Department denied him an accommodation because of his disability. Indeed, a prison-wide lockdown affected all inmates, disabled and non-disabled. In other areas of the amended complaint, Mr. Snider alleges Prison Officials failed to arrange disability

accommodations, but he does not allege what accommodations he requested or the denial of accommodations because of his disability.[260]

In his opposition to the motions to dismiss, Mr. Snider cites *Schmidt v. Odell* to support his argument the Department of Corrections is obligated to provide him modifications as a disabled inmate so his participation in a service, program, or activity is not made unusually difficult by his disability.[261] *Schmidt* is distinguishable. There, a double-amputee inmate sued prison officials under the Americans with Disabilities Act and Rehabilitation Act for discrimination or denial of benefits of basic services of the jail by reason of his disability including use of the toilet, shower, recreational areas, and meals. The court denied summary judgment in favor of the prison officials finding a genuine issue of fact as to whether prison officials failed to make a reasonable accommodation for plaintiff's disability.[262] The court rejected prison officials' argument "[t]he fact that plaintiff was actually able to use most of the jail services does not preclude his claim in light of the fact he was able to do so only by virtue of exceptional and painful exertion which was contrary to a physician's instructions concerning his disability."[263] The *Schmidt* case is distinguishable because use of bathrooms, showers, recreational activities, and meals are a program, service, or activity available to non-disabled inmates which plaintiff could not access, and the prison refused to accommodate, because of his disability. As analyzed above, the Department of Corrections does not have a program, service, or activity to provide legal assistance to its inmates from which Mr. Snider is excluded because of his disability.

We dismiss Mr. Snider's discrimination claims under the Americans with Disabilities Act and Rehabilitation Act.

***We dismiss the disability retaliation claims.***

Mr. Snider alleges Law Librarian Davis, former and current Education Principals Jamison and Newmyer, Deputy Superintendent Caro, Dr. Sheikh, Psychological Services Staff Alvarez and Stevens, and John Does One, Two, Three, and Four retaliated against him for (a) "attempting to enjoy rights guaranteed" under the Americans with Disabilities Act and Rehabilitation Act; and (b) "attempting to assist disabled persons enjoy rights guaranteed" by the Americans with Disabilities Act and Rehabilitation Act.[264]

There is no individual liability under the Rehabilitation Act.[265] We dismiss retaliation claims under the Rehabilitation Act against all individual Defendants.

Section 12203 of the Americans with Disabilities Act prohibits retaliation and interference, coercion, and intimidation for exercising rights under the Act.[266] To state a claim for retaliation under section 12203(a), Mr. Snider must allege "(1) he engaged in protected activity, (2) he suffered an adverse action after or contemporaneous with the protected activity, and (3) a causal connection between the protected activity and the adverse action."[267]

Section 12203(b) of the Americans with Disabilities Act prohibits coercion, intimidation, threats, and interference with an individual in the exercise of his own rights under the Act or because he aided or encouraged any other individual to exercise his rights under the Act. Our Court of Appeals recognizes "the scope of this second anti-retaliation provision of the ADA 'arguably sweeps more broadly' than the first."[268] To state a claim for coercion under section 12203(b), Mr. Snider must allege "when the defendant 'coerced,' 'threatened,' 'intimidated,' or 'interfered,' the plaintiff was exercising or enjoying a right protected by the ADA."[269] "Although there is little jurisprudence interpreting this provision, '[t]he language of the statute and what case law there is . . . make clear that to establish a violation of § 12203 plaintiffs must show that when the coercion

took place they were exercising or enjoying a right protected by the ADA.'"[270] "The plain words of the statute . . . preclude a party from intimidating or coercing another party not to exercise his rights under the ADA, as well as barring interference against a person who has exercised his rights under the ADA."[271]

There is some conflict among district courts in this Circuit, with no resolution from our Court of Appeals, whether individual liability may be imposed for retaliation claims under the Americans with Disability Act involving a public entity.[272] Dr. Sheikh argues there is no individual liability under the Americans with Disabilities Act and any retaliation claims against her must be dismissed.[273] We will dismiss, without resolving the legal issue whether there is individual liability under the Act, the retaliation claims because Mr. Snider fails to state a claim for retaliation for the same reasons he fails to plead retaliation under the First Amendment.

The analysis of Americans with Disabilities Act retaliation claims are substantively the same as First Amendment retaliation claims.[274] Like his First Amendment retaliation claims, Mr. Snider alleges he requested legal assistance and accommodations for legal assistance in the prosecution of *Snider I* and in his PCRA challenge in state court.[275] A request for a reasonable accommodation is protected activity under the Act.[276] He also alleges he assisted other disabled inmates file grievances regarding their disabilities.[277] Like his First Amendment retaliation claims, Mr. Snider does not plead an adverse action taken in retaliation for exercising his own rights under section 12132(a) or (b) of the Americans with Disabilities Act with the exception of a potential claim relating to the denial of medicines on two occasions in October and December 2018. But Mr. Snider does not identify who denied him medications in October 2018 and the person he alleges denied him medication in December 2018 is not a party. We dismiss the Americans with Disabilities Act retaliation claims.

**8.   We dismiss the Americans with Disabilities Act "regarded as" disabled claim.**

As analyzed in the preceding section, to state a claim for disability discrimination under either the Americans with Disabilities Act or Rehabilitation Act, Mr. Snider must allege he: (1) is a qualified individual with a disability, (2) "who was precluded from participating in a program, service, or activity, or otherwise was subject to discrimination"; (3) "by reason of his disability."[278] As defined by the Americans with Disabilities Act, the "term 'disability' means, with respect to an individual -- (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))."[279] Paragraph three, in turn, defines "regarded as having such an impairment" as: "(A) An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity. . . .."[280]

Mr. Snider alleges the Department of Corrections "regards" him as having a personality disorder based on the fabricated diagnosis of  Dr. Sheikh and fabricated notes by Psychological Services Staff Alvarez and Stevens. He claims the Department of Corrections discriminated against him and excluded him from programs, activities, and services because it "regarded him" as having personality disorder.[281] In his opposition to the motions to dismiss, Mr. Snider asserts the Department of Corrections and non-party MHM, Inc. subjected him to "exclusion, harassment, defamation, indifference, restrictive housing, and abuse by reason of their regarding him as having these impairments."[282]

This claim is directly contradicted by Mr. Snider's allegations. He alleges he is disabled from schizophrenia and bi-polar I disorder but the Department of Corrections and Prison Officials hid these diagnoses in favor of a fabricated personality disorder diagnosis which, under the Department's "policy" is treated as a non-disability, and then denied him legal assistance. Mr. Snider's theory of the case is the Department of Corrections denied him legal services because it does ***not*** consider him disabled from personality disorder. He alleges the Department maintains a policy of considering personality disorders to be "untreatable, not warranting disability accommodations or therapy."[283] A "regarded as" theory is based on a defendant's perception an individual ***is*** disabled. Mr. Snider fails to allege the programs, activities, and services of the Department of Corrections from which he is excluded or is otherwise discriminated against because the Department "regards him" as having a personality disorder. Mr. Snider fails additionally to allege any facts supporting a "regarded as" claim relating to "restrictive housing" or "abuse."

To the extent Mr. Snider alleges a failure to accommodate under a "regarded as" disabled theory, "[a] public entity is not required to provide a reasonable modification to an individual who meets the definition of 'disability' solely under the 'regarded as' prong of the definition of 'disability'" at 28 C.F.R. § 35.108(a)(1)(iii).[284]

We dismiss Mr. Snider's "regarded as" disabled claims under the Americans with Disabilities Act and Rehabilitation Act.

### 9.   Mr. Snider fails to state a defamation claim.

Mr. Snider claims Law Librarian Davis, former and current education Principals Jamison and Newmyer, Deputy Superintendent of Facilities Management Caro, Dr. Sheikh, and Psychological Services Staff members Alvarez and Stevens defamed him. We liberally interpret

Mr. Snider's claims as alleging Defendants defamed him by wrongfully diagnosing him with personality disorders which he alleges is "derogatory" and injures his "reputation and credibility."[285]

In his opposition to Defendants' motions to dismiss, Mr. Snider explains Dr. Sheikh's November 2018 diagnosis of personality disorder is not true and defamatory.[286] He asks he be allowed to amend his complaint to allege the contents of Dr. Sheikh's diagnosis and the opinions by Dr. Sheikh and Psychological Support Staff are actionable because they are based on "false material information" and used to punish him for his attempted court access, to "cover-up" his legal claims and need for mental health care. He contends the medical diagnosis, with which he disagrees, has and will injure his legal claims, good name, honor, integrity, and reputation, injured his reputation with the Court, and will injure his ability to obtain "meaningful mental health care for decades into the future and possibly for the rest of his life."[287]

Mr. Snider alleges the psychology staff at SCI-Somerset, and particularly Dr. Sheikh's false diagnosis, is defamatory under the Fifth and Fourteenth Amendments and Pennsylvania law. His defamation claim fails as a matter of law and we dismiss it.

The Fifth Amendment provides, *inter alia*, "no person shall . . . be deprived of life, liberty, or property, without due process of law."[288] The Fifth Amendment, however, applies only to  the federal government, not state actors.[289] None of defendants are federal officials so Mr. Snider's claim under the Fifth Amendment fails and we dismiss it with prejudice.

Mr. Snider may look to the Fourteenth Amendment's protections prohibiting the States' deprivation of "life, liberty, or property, without due process of law."[290]  Mr. Snider's Fourteenth Amendment defamation claim fails. Even assuming a diagnosis of personality disorder is defamatory, an interest in one's reputation is "neither 'liberty' nor 'property' guaranteed against

state deprivation without due process of law."[291] Mr. Snider fails to allege reputational harm and an additional deprivation of a protected right or interest.[292] His defamation claim under the Fourteenth Amendment fails.

Mr. Snider's defamation claim under Pennsylvania law is similarly infirm. Under Pennsylvania law, Mr. Snider must plead seven elements to state a claim for defamation: (1) the defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm resulting to the plaintiff from its publication; and (7) abuse of a conditionally privileged occasion.[293]

"Defamation is a communication which tends to harm an individual's reputation so as to lower him or her in the estimation of the community or deter third persons from associating or dealing with him or her."[294] Under Pennsylvania law, "only statements of fact can support an action for libel or slander, not merely expressions of opinion."[295] "Whether a particular statement or writing constitutes fact or opinion is a question of law for the court"[296] and whether a challenged statement is capable of defamatory meaning is a question of law for the court to determine in the first instance.[297] "In making this determination, we view the statement in its factual context, because the key in determining defamatory meaning is the effect the statement would produce on its intended audience."[298]

Dr. Sheikh's assessment diagnosing Mr. Snider with personality disorder is a medical opinion and is not actionable.[299] Even if Dr. Sheikh's diagnosis is a statement of fact, there are no allegations Dr. Sheikh published her diagnosis, a recipient understood its defamatory meaning,

special harm, or abuse of a conditional privilege. We dismiss the defamation claim against Dr. Sheikh.

Mr. Snider additionally alleges Psychological Services Staff members Alvarez and Stevens placed false information—and allegedly defamatory statements—in his medical file which Dr. Sheikh relied on in reaching her diagnosis.  Mr. Snider alleges:

- Ms. Alvarez noted in his medical records "inmate rambled on . . .";[300]

- Ms. Stevens noted "[Inmate] was resistant to discussion that suggested he might have to change his behaviors to receive varied outcomes. Also attempted to discuss stress reduction plans and techniques. [Inmate] was dismissive and appeared annoyed at conversation";[301]

- Ms. Alvarez noted "PSS met with inmate . . . No acute MH concerns at this time . . . Inmate discussed his frustrations with the inmate below his cell playing a keyboard which is driving him nuts and makes him want to hurt himself. PSS encouraged inmate to consider that in prison others are allowed to implement their coping skills and for some, music is their coping skill. Inmate reported how he gets agitated quickly with others and has no regard for them although he understands that others have issues and rights – he just gets agitated by them";[302]

- Ms. Alvarez noted ". . . Inmate was argumentative . . . PSS educated inmate how the teacher has communicated how well inmate does working with others for her and inmate stated, "I know how to hide symptoms and when to display symptoms." . . . inmate reported that he cannot go into GP [General Population] as he will have symptoms, bang his head, and attempt to kill himself in less than a month of being in GP";[303]

- Ms. Alvarez noted ". . . Inmate got angry and pounded his fists on the desk and screamed 'How can you help me then?' PSS . . . stated that she could help him with coping skills, and . . . talk to the psychiatrist . . . Inmate laughed at PSS and stated, 'in POC I can bang my head all I want[.]' PSS asked inmate why he bangs his head and inmate stated, ". . . I want help with my legal work. PSS asked why inmate is taking time away from his goal of getting things done, inmate responded with trying to get assistance with his legal work . . . PSS suggest for inmate to choose himself over others";[304]

- Ms. Alvarez noted ". . . inmate did attempt to manipulate circumstances and get others to say what he wanted them to . . . Ms. Davis asked why inmate completely disregarded her instruction, inmate argued that another inmate told him it was 'ok.' Inmate was explained that his actions are like going from one parent to another to get the answers he wants to hear. Inmate verbalized his criteria for Bipolar I and applied that as to how he deserves more time in the library. The principal showed inmate that he asked his boss for time off to use the library but inmate did not use the time he was allotted. Inmate again versed his

criteria for bipolar, explained that he no longer has personality disorders and he cannot have a diagnosis of them because it will negatively impact his criminal case. PSS had to redirect inmate to the discussion at hand several times . . .";[305]

- Ms. Alvarez noted "Inmate stopped PSS on walk. Inmate insisted PSS speak with him. PSS advised inmate that a conversation can be had on the unit. Inmate became agitated and demanded to spoken to [sic] at that time. PSS reiterated that he will be seen on the unit."[306]

- In response to a grievance written by Law Librarian Davis and signed by Principal Newmyer quotes Ms. Stevens as justifying the denial of legal assistance by stating: "There is nothing that would indicate [Mr. Snider] has a disability that would interfere with his ability to understand legal materials. In fact, he appears very well versed in legal matters . . .."[307]

Mr. Snider alleges these notes in his medical record do not qualify as an opinion because the statements are factually incorrect and "can be disproven" by him.[308] We find these statements are not capable of defamatory meaning. Even if the notations in the medical record are statements of fact, and not opinion, there are no allegations Ms. Alvarez and Ms. Stevens published the records, a recipient understood its defamatory meaning, special harm, or abuse of a conditional privilege. We dismiss Mr. Snider's defamation claim against these individuals.

**B.      We dismiss the Pennsylvania medical malpractice claims against Dr. Sheikh.**

Dr. Sheikh moves to dismiss Mr. Snider's medical negligence claim for failing to file a Certificate of Merit under Pennsylvania Rule of Civil Procedure 1042.3.[309] Rule 1042.3 provides: "In any action based upon an allegation that a licensed professional deviated from an acceptable professional standard, the attorney for the plaintiff, or the plaintiff if not represented, shall file with the complaint or within sixty days after the filing of the complaint, a certificate of merit signed by the attorney or party" attesting "(1) an appropriate licensed professional has supplied a written statement that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional standards and that such conduct was a cause in bringing about the harm,

or (2) the claim that the defendant deviated from an acceptable professional standard is based solely on allegations that other licensed professionals for whom this defendant is responsible deviated from an acceptable professional standard, or (3) expert testimony of an appropriate licensed professional is unnecessary for prosecution of the claim."[310]

Pennsylvania's rule is a "substantive state law that federal district courts must apply."[311] The rule applies to incarcerated and *pro se* plaintiffs.[312] "If a plaintiff does not comply with Rule 1042.3, the claims will be dismissed and a judgment of *non pros* entered upon a motion by the defendant."[313] Failure to comply with the rule is not fatal to a malpractice claim "if the plaintiff can show a 'reasonable excuse' for the noncompliance."[314]

On January 22, 2019, Dr. Sheikh filed a Notice under Pennsylvania Rule of Civil Procedure 1042.7 and Federal Rule of Civil Procedure 12(b)(6) of her intention to enter a judgment of *non pros* against Mr. Snider after thirty days if he did not file a Certificate of Merit.[315] On February 19, 2019, Mr. Snider moved for a ninety-day extension of time to file a Certificate of Merit.[316]

In our February 27, 2019 order, we, *inter alia,* granted Mr. Snider's Motion for extension of time; we did not enter judgment of default and we stayed the matter until we could make a finding on Mr. Snider's competency in *Snider I*.[317]

On September 30, 2019, we found Mr. Snider competent in *Snider I*.[318]  We lifted the stay in this case on the same day and ordered all defendants to respond to Mr. Snider's amended complaint by October 15, 2019.[319]

Dr. Sheikh filed her Motion to dismiss on October 15, 2019, including to dismiss the medical malpractice claim against her for failure to file a Certificate of Merit.[320] In the year since Dr. Sheikh filed her Motion, Mr. Snider failed to obtain a Certificate of Merit. In response to the Motion, Mr. Snider argues he contacted forensic psychiatric experts but none will take on the

matter and filed a motion for appointment of an expert which we denied.[321] Mr. Snider argues he filed a motion for leave to take discovery to obtain evidence necessary for review by an expert which he asserts we denied. We cannot find in the record the motion he refers to or the order denying it. He now argues we should not dismiss his claims for lack of a Certificate of Merit because he "has not been allowed to obtain the evidence needed for an expert to review and because [he] cannot obtain a mental health expert on his own an needs appointment of such."[322]

Notably, Mr. Snider requested the court in *Snider v. Gilmore,* currently pending in the Western District of Pennsylvania, to appoint him an expert for the purpose of obtaining a Certificate of Merit for his professional liability claims in that action which the court recently denied.[323] In denying his motion, the court concluded "[t]here is simply no statutory authority that allows district courts to appoint experts to file certificates of merit on behalf of plaintiffs who are unable to obtain them or provide expert witness fees for indigent parties in civil actions."[324]

Mr. Snider is not exempt from complying with the Certificate of Merit requirement because he is *pro se* or his incarceration.[325] Dr. Sheikh filed a notice of intent to file a judgment of *non pros* for the lack of a Certificate of Service in January 2019, twenty-two months ago. We denied Dr. Sheikh's motion and granted Mr. Snider's February 2019 request for a ninety-day extension to obtain a Certificate of Merit giving him until approximately the end of May 2019 to secure it. He failed to do so. He now fails to present a reasonable explanation or legitimate excuse for noncompliance with the Certificate of Merit requirement.[326] We grant Dr. Sheikh's motion to dismiss the medical malpractice and negligence claims against her.

### C.     We deny the Department's and Prison Officials' motion under Rule 20.

The Department and Prison Officials move to dismiss Mr. Snider's claims for improper joinder of parties under Federal Rule of Civil Procedure 20 and ask we order Mr. Snider to file

separate complaints for his factually distinct claims.[327] Mr. Snider argues this would be "manifestly unjust and would cause further confusion of the claims."[328]

Under Rule 20, Mr. Snider may "join defendants in one action if he asserts a right to relief arising out of the same transaction or occurrence and 'any question of law or fact common to all defendants will arise in the action.'"[329] Our Court of Appeals recognized an incarcerated individual's claims involving denial of court access, retaliatory actions by prison officials, fraudulent misconduct, interference with his mail, and inadequate grievance procedures, were not improperly joined under Rule 20.[330] The court explained the incarcerated plaintiff need not raise claims in separate complaints because the incidents all occurred within a few months and all involved his "treatment as a pretrial detainee in one prison."[331] And under Rule 21, "[m]isjoinder of parties is not a ground for dismissing an action."[332]

Mr. Snider's claims all arise from his incarceration at SCI-Somerset and largely involve his mistreatment and difficulties accessing the court during his time there. We deny the Department's motion to dismiss Mr. Snider's amended Complaint for failing to comply with Rule 20.

## V. Conclusion

Mr. Snider sufficiently pleads Psychological Services Staff Robin Alvarez and Stevens violated his Eighth Amendment rights to be free from deliberate indifference in their treatment of his demonstrated and documented mental illness. He must now prove this claim. Mr. Snider fails to sufficiently plead other claims under federal or Pennsylvania law. We dismiss his remaining claims.

[1] ECF Doc. No. 28 at 1.

[2] In addition to the Department of Corrections, Mr. Snider sues Secretary of the Department of Corrections John Wetzel, Director of the Pennsylvania Board of Probation and Parole Leo Dunn, SCI-Somerset employees Law Librarian Dawn Davis, former Education Principal Nick Jamison, current Education Principal M. Newmyer, Superintendent of SCI-Somerset Eric Tice, Mailroom Supervisor Caitlyn Weigle, Business Manager Dennis Decker, Deputy Superintendent of Facilities Management Dan Caro, Grievance Coordinator Christine Schenk, Psychological Services Staff member Robin Alvarez, Psychological Services Staff member Stevens, and Superintendent of SCI-Fayette Mark Capozza (collectively, "Prison Officials") and John Does One, Two, Three, and Four. Mr. Snider never identifies Staff member Stevens' first name.

Mr. Snider initially sued Officer McKeehan and other individuals as well as SCI-Coal, SCI-Camp Hill, and the United States District Court for the Middle District of Pennsylvania. *See* ECF Doc. No. 1. In our October 22, 2018 Order granting Mr. Snider's motion for leave to proceed *in forma pauperis*, denying his motion to appoint counsel, and granting his motion for leave to file a supplemental complaint, we dismissed with prejudice his claims against SCI-Coal, SCI-Camp Hill, and the United States District Court for the Middle District of Pennsylvania. ECF Doc. No. 15. Mr. Snider admitted he initially raised claims against Defendant Officer McKeehan and others in two other lawsuits at No. 13-1226, pending before Judge Brann, and No. 15-951 pending before us. We found, to the extent Mr. Snider raised claims he raised in earlier lawsuits, his complaint malicious. ECF Doc. No. 15 at ¶ 4, n. 2. We dismissed Mr. Snider's complaint and "supplemental complaint" (ECF Doc. Nos. 1, 16) but allowed him to file an amended complaint. Mr. Snider filed his amended complaint and did not name Officer McKeehan, other prison staff, SCI-Coal, and SCI-Camp Hill. The caption of the case, however, remained *Snider v. Officer McKeehan, et al.* until today's accompanying Order.

[3] ECF Doc. No. 28 at ¶ 318.

[4] *Id.* at ¶ 319.

[5] *Id.* at ¶¶ 320–321.

[6] ECF Doc. No. 28-2 at 8 (using the pagination assigned by the CM/ECF docketing system). On December 20, 2019, Mr. Snider moved for leave to supplement the complaint. ECF Doc. No. 82. Mr. Snider attempted to add four claims and five new defendants to his amended Complaint. We denied his Motion on January 3, 2020 without prejudice to timely pursue claims in the Western District of Pennsylvania where SCI-Somerset is located. ECF Doc. No. 86. Mr. Snider refers to his attempted "Second Supplementary Complaint" or "Supp II" throughout his response to Defendants' motions to dismiss. We will not consider facts alleged in "Supp II" as they are not before us.

[7] *Snider I*, second amended Complaint, ECF Doc. No. 237, at ¶ 6.

[8] From what we can gather from other filings in this and *Snider I*, the Department of Corrections housed Mr. Snider at SCI-Coal Township, SCI-Camp Hill, and SCI-Greene between 2014 and July 2017.

[9] ECF Doc. No. 28 at ¶ 57.

[10] Docket sheet, *Commonwealth v. Snider*, CP-60-CR-340-2010, Union County Court of Common Pleas.

[11] *Id.*

[12] *Commonwealth v. Snider*, No. 2013 MDA 2016, 2017 WL 5938815 (Pa. Super. Ct. Nov. 21, 2017).

[13] *Id.* at *2.

[14] Docket sheet, *Commonwealth v. Snider*, CP-60-CR-340-2010, Union County Court of Common Pleas.

[15] *Id.*

[16] *Commonwealth v. Snider*, No. 1161 MDA 2019, 2020 WL 6375386 (Pa. Super. Ct. Oct. 30, 2020).

[17] On June 30, 2020, we dismissed the "United States Government," the United States, the United States District Court for the Middle District of Pennsylvania, and former Acting Attorney General Matthew Whittaker after Mr. Snider moved to withdraw those claims. *Snider I*, No. 15-951, ECF Doc. Nos. 426, 435, 437.

[18] *Snider I,* No. 15-951, ECF Doc. No. 237 at ¶¶ 81–96.

[19] Department of Corrections Policy Statement at 1, https://www.cor.pa.gov (footnote omitted).

[20] *Id.* at 2-1.

[21] *Id.*

[22] *Id.*

[23] *Id.* at 2-2.

[24] ECF Doc. No. 28 at 2; ¶¶ 26–27.

[25] *Id.* at ¶ 26.

[26] *Id.* at ¶ 28.

[27] *Id.* at ¶ 30.

[28] *Id.* at ¶¶ 31–32.

[29] *Id.* at ¶¶ 57–60.

[30] *Id.* at ¶¶ 61–63.

[31] *Id.* at ¶¶ 65–66.

[32] *Id.* at ¶ 72.

[33] *Id.* at ¶ 73.

[34] *Id.* at ¶ 68.

[35] *Id.* at ¶¶ 69, 74.

[36] *Id.* at ¶¶ 75–80.

[37] *Id.* at ¶¶ 79–80.

[38] *Id.* at ¶81.

[39] *Id.* at ¶ 82. Mr. Snider also filed a request with the Office of General Counsel of the Department of Corrections for the file. *Id.*

[40] *Id.* at ¶ 83.

[41] *Id.* at ¶ 85.

[42] *Id.* at ¶¶ 85-90.

[43] *Id.* at ¶¶ 86-87. The docket shows on February 28, 2018, Chief Magistrate Judge Schwab held a status conference call to discuss the case and informed Mr. Snider he may not file a supplemental complaint. ECF Doc. No. 188. We fail to see the harm caused by this episode as the court in *Snider I* permitted Mr. Snider to file a second amended Complaint on December 21, 2018, which is the current operative complaint (*see* ECF Doc. No. 237).

[44] *Id.* at ¶¶ 88–94.

[45] *Id.* at ¶¶ 117–142.

[46] *Id.* at ¶¶ 138–148.

[47] *Id.* at ¶¶ 98–99.

[48] *Id.* at ¶¶ 100–104.

[49] *Id.* at ¶ 104.

[50] *Id.* at ¶ 174.

[51] *Id.*

[52] *Id.* at ¶ 175.

[53] *Id.* at ¶ 179.

[54] *Id.* at ¶ 181.

[55] *Id.* at ¶¶ 182–184.

[56] *Id.* at ¶¶ 185–186.

[57] *Id.* at ¶¶ 187–189.

[58] *Id.* at ¶ 191.

[59] *Id.* at ¶¶ 192–195.

[60] *Id.* at ¶¶ 196–201.

[61] *Id.* at ¶¶ 203–06. Mr. Snider alleges the purpose of the Unit under Department of Correction policy is to provide structure and support to inmates with psychiatric disorders. *Id.* at ¶¶ 106–107.

[62] *Id.* at ¶ 207.

[63] *Id.* at ¶¶ 208–210.

[64] *Id.* at ¶¶ 210–212.

[65] *Id.* at ¶ 213.

[66] *Id.* at ¶¶ 214–216.

[67] *Id.* at ¶¶ 217, 219.

[68] *Id.* at ¶ 218.

[69] *Id.* at ¶ 220.

[70] *Id.* at ¶ 221.

[71] *Id.*

[72] *Id.* at ¶ 222.

[73] *Id.* at ¶¶ 222–223.

[74] *Id.* at ¶¶ 230–231.

[75] *Id.* at ¶¶ 232–235. The PCRA court denied Mr. Snider's PCRA petition on June 7, 2019. Mr. Snider appealed to the Pennsylvania Superior Court. The Pennsylvania Superior Court remanded the case for a hearing under *Commonwealth v. Grazier*, 713 A.2d 81 (Pa. 1998). The PCRA court held a *Grazier* hearing on January 30, 2020, permitted PCRA counsel to withdraw, and appointed new counsel. *See Commonwealth v. Snider*, No. 1161 MDA 2019, 2020 WL 6375386, at * 2 (Pa. Super. Ct. Oct. 30, 2020).

[76] *Id.* at ¶ 236.

[77] *Id.* at ¶¶ 237–238.

[78] *Id.* at ¶ 240; *Snider v. United States, et al.*, No. 18-1789.

[79] ECF Doc. No. 28 at ¶ 241.

[80] *Id.* at ¶¶ 243–244.

[81] *Id.* at ¶¶ 245–246.

[82] *Id.* at ¶¶ 247–253.

[83] *Id.* at ¶ 252.

[84] *Id.* at ¶¶ 253–254. On October 2, 2018, we dismissed Mr. Snider's action against the United States and the United States District Court of the Middle District of Pennsylvania under the Rehabilitation Act alleging the District Court did not afford him relief in two earlier cases before the Court, including one where he seeks the same relief. We dismissed Mr. Snider's duplicative claim, explaining he cannot sue the federal court because he is disappointed with its orders; the United States and its federal courts are immune from this claim; and, the Rehabilitation Act does not apply to the district courts. We explained Mr. Snider is already pursuing this relief against the United States in *Snider I. See Snider v. United States*, No. 18-1789, ECF Doc. Nos. 10, 11.

[85] *Id.* at ¶¶ 255–256.

[86] *Id.* at ¶¶ 284–285.

[87] *Id.* at ¶¶ 258–263.

[88] *Id.* at ¶ 264.

[89] *Id.* at ¶ 265.

[90] *Id.* at ¶ 270.

[91] *Id.* at ¶¶ 271–272.

[92] *Id.* at ¶ 272.

[93] *Id.* at ¶ 273.

[94] *Id.* at ¶ 282.

[95] *Id.* at ¶ 283.

[96] *Id.* at ¶¶ 286–287.

[97] *Id.* at ¶¶ 266–267.

[98] *Id.* at ¶ 293.

[99] *Id.* at ¶ 294.

[100] *Id.* at ¶ 295.

[101] *Id.* at ¶¶ 296, 299.

[102] *Id.* at ¶ 297.

[103] *Id.* at ¶ 302.

[104] *Id.* at ¶ 303.

[105] *Id.* at ¶ 306.

[106] *Id.* at ¶ 267.

[107] *Id.* at ¶ 305.

[108] *Id.* at ¶¶ 306–307.

[109] *Id.* at ¶¶ 306–313.

[110] *Id.* at ¶¶ 320–324. We dismissed Mr. Snider's April 2018 complaint under Federal Rule of Civil Procedure 8. Mr. Snider's initial Complaint did not plead a factual basis for his claims sufficiently

clear for Defendants to meaningfully respond. We granted Mr. Snider leave to file an amended complaint identifying the Defendants in the caption in addition to the body and pleading the basis for his claims against each Defendant. In the interest of judicial economy, we granted Mr. Snider leave to file a single pleading with all his claims for relief. After we granted him an extension, Mr. Snider filed his amended Complaint on December 14, 2018.

[111] *Id.* at ¶ 330.

[112] *Id.* at ¶ 321.

[113] *Id.* at ¶ 322.

[114] *Id.* at ¶ 333.

[115] *Id.* at ¶ 334.

[116] *Id.* at ¶ 335.

[117] *Id.* at ¶ 336.

[118] *Id.* at ¶ 337.

[119] *Id.* at ¶ 338.

[120] ECF Doc Nos. 72, 73.

[121] ECF Doc No. 67.

[122] ECF Doc No. 89.

[123] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

[124] *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (quoting *Twombly*, 550 U.S. at 570).

[125] *Siwulec v. J.M. Adjustment Servs., LLC*, 465 F. App'x 200, 202 (3d Cir. 2012) (quoting *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007) and *Iqbal*, 556 U.S. at 678).

[126] *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 675, 679).

[127] *Boyer v. Mohring*, 994 F. Supp. 2d 649, 654 (E.D. Pa. 2014); *see Higgs v. Attorney Gen. of the United States*, 655 F.3d 333, 339 (3d Cir. 2011), *as amended* (September 19, 2011) ("[W]hen presented with a *pro se* litigant, we 'have a special obligation to construe his complaint liberally.'" (quoting United States v. Miller, 197 F.3d 644, 648 (3d Cir. 1999))).

[128] 28 U.S.C. § 1915(e)(2)(B)(i)–(iii).

[129] *Elansari v. Univ. of Pennsylvania*, 779 F. App'x 1006, 1008 (3d Cir. 2019) (citing *Allah v. Seiverling*, 229 F.3d 220, 223 (3d Cir. 2000)).

[130] 430 U.S. 817 (1977).

[131] 518 U.S. 343 (1996).

[132] *Lewis*, 518 U.S. at 346.

[133] *Id.* at 351 (emphasis in original).

[134] *Id.* (quoting *Bounds*, 430 U.S. at 825).

[135] *Id.* at 355. *See also Monroe v. Beard*, 536 F.3d 198, 205–06 (3d Cir. 2008) (citing *Lewis*, 518 U.S. at 354–55) ("prisoners may only proceed on access-to-courts claims in two types of cases, challenges (direct or collateral) to their sentences and conditions of confinement").

[136] *Christopher v. Harbury*, 536 U.S. 403, 412–13 (2002). *See also Milas v. Wetzel*, No. 19-313, 2020 WL 3840345, at *2, n.2 (W.D. Pa. July 7, 2020) (describing "forward-looking" and "backward-looking" claims).

[137] *Christopher*, 536 U.S. at 414 (citations omitted) (footnotes omitted); *Milas*, 2020 WL 3840345, at *2, n.2.

[138] *Monroe*, 536 F.3d at 205 (quoting *Christopher*, 536 U.S. at 415).

[139] *Prater v. Wetzel*, F. App'x 177, 178 (3d Cir. 2015) (citing *Lewis*, 518 U.S. at 351).

[140] *Aruanno v. Main*, No. 07–3867, 2010 WL 251590, at *9 (D.N.J. Jan. 15, 2010) (collecting cases).

[141] *Almahdi v. Ashcroft*, 310 F. App'x 519, 522 (3d Cir. 2009) (quoting *Strandberg v. City of Helena*, 791 F.2d 744, 747 (9th Cir.1986)).

[142] *Nelson v. Quigley*, No. 15-4670, 2016 WL 2959284, at *1 (E.D.Pa. May 23, 2016) (quoting *Aruanno*, 2010 WL 251590 at * 10).

[143] *Nixon v. Sec'y Pa. Dep't of Corr.* 501 F. App'x 176, 178 (3d Cir. 2012) (quoting *Jones v. Brown*, 461 F.3d 353, 358 (3d Cir.2006)).

[144] ECF Doc. No. 28 at ¶ 83.

[145] *Id.* at ¶ 243.

[146] *Nixon*, 501 F. App'x at 178, n.2 (citing *Lewis*, 518 U.S. at 355).

[147] ECF Doc. No. 89 at 34.

[148] *Commonwealth v. Snider*, 1161 MDA 2019 (Pa. Super. Ct.).

[149] *Snider v. Corbett* settled with assistance from Mr. Snider's court-appointed volunteer counsel. Mr. Snider then challenged the settlement and is now on appeal in our Court of Appeals.

[150] *Snider I*, No. 15-951, at ECF Doc. Nos. 426, 435, 437.

[151] ECF Doc. No. 28 at ¶ 330. We analyze retaliation under the Americans with Disabilities Act in a later section.

[152] In response to Defendants' motions to dismiss, Mr. Snider argues only First Amendment retaliation. Although pleaded, Mr. Snider does not respond to the motions to dismiss his Eighth Amendment retaliation claim. Having failed to respond to the Eighth Amendment retaliation claim, we consider it abandoned.

[153] ECF Doc. No. 89 at 6–10.

[154] *Jackson v. Carter*, 813 F. App'x 820, 825 (3d Cir. 2020) (quoting *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003)).

[155] ECF Doc. No. 28 at ¶ 25.

[156] *Lavia v. Pa. Dep't of Corr., State Corr. Inst. at Greene*, 224 F.3d 190, 195 (3d Cir. 2000) (recognizing that the Pennsylvania Department of Corrections "shares in the Commonwealth's Eleventh Amendment immunity"); *Kokinda v. Pennsylvania Dep't of Corr.*, 779 F. App'x 944, 948 (3d Cir. 2019) (district court properly dismissed plaintiff's section 1983, 1985(e), and 1986 claims against the Department of Corrections and individual prison staff sued in their official capacities as barred by the Eleventh Amendment) (citing *Pa. Fed'n of Sportsmen's Clubs, Inc. v. Hess*, 297 F.3d 310, 323 (3d Cir. 2002)).

[157] *Jones v. Unknown D.O.C. Bus Driver and Transportation Crew*, 944 F.3d 478, 482–83 (3d Cir. 2019) (citing *Will v. Mich. Dep' of State Police*, 491 U.S. 58, 71 (1989) (noting that a suit against a state official in his official capacity is a suit against his office and cannot proceed under § 1983).

[158] *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).

[159] *Id.*

[160] *Shaw v. Murphy*, 532 U.S. 223 (2001); *Watlington on behalf of FCI Schuylkill African American Inmates v. Reigel*, 723 F. App'x 137, 139–40 (3d Cir. 2018). Under *Wisniewski v. Fisher*, 857 F.3d 152 (3d Cir. 2017), an inmate "plausibly alleged that his conduct in assisting his assigned inmate prepare a grievance, which was both pursuant to his job duties and in accordance with prison regulations, was not inconsistent with legitimate penological interests, and therefore could fall within the limited First Amendment rights that prisoners retain." *Id.* at 156. Unlike *Wisniewski*,

Mr. Snider does not allege he helped other inmates in accordance with his job duties at the prison or the prison assigned him to help other inmates. To the contrary, Mr. Snider alleges he is "a generous and empathetic person who fees a heartfelt desire to give assistance to those around him whose civil rights and basic human rights are being violated." ECF Doc. No. 28 at ¶ 145. *See Watlington*, 723 F. App'x at 140.

[161] *Robinson v. Taylor*, 204 F. App'x 155, 157 (3d Cir. 2006) (citing *Mitchell*, 318 F.3d at 530; *Davis v. Goord*, 320 F.3d 346, 352–53 (2d Cir.2003)).

[162] ECF Doc. No. 89 at 10-11.

[163] *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001) (citing *Allah*, 229 F.3d at 225).

[164] *Hawkins v. Brooks*, 694 F.Supp.2d 434, 442 (W.D. Pa. 2010). *See Watson v. Rozum*, 834 F.3d 417, 423 (3d Cir. 2016) (citing *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006)).

[165] *Dunbar v. Barone*, 487 F. App'x 721, 723 (3d Cir. 2012) (citing *Mitchell*, 318 F.3d at 530; *Rauser*, 241 F.3d at 333; *Allah*, 229 F.3d at 225–26).

[166] *Dunbar*, 487 F. App'x at 723. *See also Burgos v. Canino,* 358 F. App'x 302, 306 (3d Cir. 2009) ("[T]hreats alone do not constitute retaliation ... the claim relating to the threat failed."); *Cooper v. Sherman*, No. 17-2064, 2019 WL 2408973, at *7 (M.D. Pa. June 7, 2019) ("It is well settled, however, that verbal threats or verbal harassment, even if acted upon, do not constitute adverse action for purposes of establishing a First Amendment retaliation claim."); *Bartelli v. Lewis*, No. 04-908, 2005 WL 2406048, at *2 (M.D. Pa. Sept. 29, 2005) ("[V]erbal threats do not constitute an 'adverse action' and, therefore, do not fulfill a requisite element of a retaliation claim[.]").

[167] ECF Doc. No. 89 at 11 citing amended complaint at ECF Doc. No. 28, ¶¶ 208–211.

[168] *Jordan v. Murin*, No. 18-228, 2019 WL 3997897, at *6 (footnote omitted) (W.D. Pa. July 25, 2019), *report and recommendation aff'd*, 2019 WL 3997245 (W.D. Pa. Aug. 23, 2019).

[169] *Whitenight v. Harry*, No. 16-1350 2019 WL 1782139, at *13 (M.D. Pa. Jan. 23, 2019), *report and recommendation aff'd*, 2019 WL 1779507 (M.D. Pa. Apr. 23, 2019). This includes his allegation non-party Superintendent Hainsworth harassed him by grabbing his legal papers and holding them up to his face. ECF Doc. No. ¶ 213.

[170] *Id.*

[171] ECF Doc. No. 28 at ¶¶ 202–204, 245–246, 262–263, 309.

[172] *Id.*at ¶ 222.

[173] *Id.* at ¶ 256.

[174] *Id.* at ¶¶ 232–234, 236, 286–287.

[175] *Id.* at ¶¶ 83, 243.

[177] In his opposition to the motions to dismiss, Mr. Snider identifies "refusal to allow purchases from the commissary" citing paragraph 230 of his amended Complaint where Mr. Snider alleges he purchased a watchband. When delivered, Mr. Snider alleges Mailroom Supervisor Weigle "refused to notify him," "made him write several departments," and instructed him to file a grievance. This is *de minimus* action which does not state a retaliation claim.

[178] ECF Doc. No. 28 at ¶¶ 250, 313.

[179] *DeFranco v. Wolfe*, 387 F. App'x 147, 154 (3d Cir. 2010) (citing *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)).

[180] *Pearson v. Sec'y Dep't of Corr.*, 775 F.3d 598, 604 (3d Cir. 2015) (quoting *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997)).

[181] *Sanders v. Rose*, 808 F. App'x 102 (3d Cir. 2020).

[182] *Mitchell*, 318 F.3d 530 (citing *Allah*, 229 F.3d at 225) (holding a prisoner stated a retaliation claim when he alleged a prison official confined him in administrative segregation to punish him for making civil rights complaints); *Kelly v. York County Prison*, 340 F. App'x. 59, 61 (3d Cir. 2009) (citing *Mitchell*, 318 F.3d at 530).

[183] *Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020) (quoting *Rode*, 845 F.2d at 1207).

[184] ECF Doc. No. 28 at ¶¶ 250, 312–313.

[185] Even if we could find the litany of grievances constituted adverse actions, we could not find personal involvement. For example:

- Transfer from one side of the residential housing unit to the other, transfer to the Union County jail, and separation from inmate witnesses: Mr. Snider alleges someone moved him from one side of the residential housing unit to the other. He does not allege who authorized the move. He alleges non-party Officer Powers "repeatedly explained" to Ms. Alvarez, and other non-parties, it would not be wise to move Mr. Snider given his mental status. Mr. Snider alleges Ms. Alvarez "did not listen" to Officer Powers and, we can plausibly infer, had actual knowledge and acquiescence of the move. While Mr. Snider complains of other transfers allegedly in retaliation for his protected activity, he fails to allege any of the identified Defendants had personal involvement in the transfers. He alleges Law Librarian Davis "saw an affidavit" of another inmate, Mr. Sommerville, whose testimony Mr. Snider intends to use in *Snider I*. Someone then moved Mr. Sommerville away from Mr. Snider. He does not allege Law Librarian Davis's personal involvement in the transfer of Mr. Sommerville. Mr. Snider alleges someone transferred another inmate, Donald Scott, after Mr. Snider attached Mr. Scott's declaration to a filing in *Snider I*. There are no allegations of any Defendants' personal involvement in this alleged retaliatory conduct. Mr. Snider alleges someone transferred him from SCI- Somerset to the Union County prison. There

are no allegations of Defendants' personal involvement in this alleged retaliatory conduct. ECF Doc. No. 28 at ¶¶ 202–206, 245–246, 262–263, 309.

- Theft of his legal book by John Doe One: Mr. Snider alleges John Doe One stole a law book his father purchased and mailed to him, sufficiently alleging personal involvement by John Doe One. Mr. Snider alleges his father attempted to resolve the missing book by speaking to Mailroom Supervisor Weigle and Business Manager Decker.  He alleges they "refused to informally resolve the matter and insisted . . . Mr. Snider file a grievance." There are no allegations of Mailroom Supervisor Weigle's and Business Manager Decker's personal involvement with the theft of the law book. *Id.* at ¶¶ 222–223.

- Destruction of his typewriter: Mr. Snider alleges non-party Sergeant McCool returned to Mr. Snider his typewriter in broken condition. There are no allegations of Defendants' personal involvement in breaking or damaging the typewriter. *Id.* at ¶ 256.

- Restricting communication with counsel, including refusing to allow him to bring pre-approved legal materials to a pre-approved visit with counsel, turning counsel away from a visit, and causing a video and audio feed for a court appearance in *Snider I* by John Doe Three: Mr. Snider alleges John Doe Three caused the audio/visual feed for a court appearance in *Snider I* to malfunction. He fails to allege which, if any of the Defendants, turned his attorney away from a visit. He alleges non-party "Officer Carr" refused to allow him to bring pre-approved legal materials to a pre-approved visit with counsel. There are no allegations of Defendants' personal involvement. *Id.* at ¶¶ 232–234, 236, 286–287.

- Impeding mail: Mr. Snider alleges he received mail in *Snider I* cut in half and the Department of Corrections refused receipt of mail from his father. Mr. Snider fails to allege Defendants' personal involvement. *Id.*at ¶¶ 83, 243.

[186] ECF Doc. No. 28 at ¶ 333.

[187] ECF Doc. No. 89 at 26-27.

[188] *Christopher*, 536 U.S. at 410.

[189] *Id.* at 407–08.

[190] *Id.* at 409–10 (internal citation omitted) (footnote omitted).

[191] *Id.* at 410.

[192] *Id.* at 414–15.

[193] *Id.* at 415.

[194] *Harvard v. Cesnalis*, 973 F.3d 190, 207 (3d Cir. 2020) (quoting *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 293-94 (3d Cir. 2018) (internal quotation marks and citation omitted)).

[195] *Id.* (citing *Jutrowski*, 904 F.3d at 295).

[196] *Schlager v. Beard*, 398 F. App'x 699, 702 (3d Cir. 2010) (citing *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 254 (3d Cir.1999), *superseded by statute on other grounds as recognized by P.P. v. West Chester Area Sch. Dist.*, 585 F.3d 727 (3d Cir.2009)).

[197] *Lake v. Arnold*, 112 F.3d 682, 685 (3d Cir. 1997).

[198] *Whitehead v. Wetzel*, 720 F. App'x 657, 662 (3d Cir. 2017).

[199] ECF Doc. No. 28 at ¶ 321.

[200] 42 U.S.C. § 1983.

[201] *Parkell v. Danberg*, 833 F.3d 313, 330 (3d Cir. 2016).

[202] *Santiago v. Warminster Twp.*, 629 F.3d 121, 128-29 & n. 5 (3d Cir. 2010) (quoting *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004)).

[203] *Leisure v. Lancaster Cnty. Prison*, 750 F. App'x 89, 92, n.3 (3d Cir. 2018) (citing *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014), *rev'd on other grounds, Taylor v. Barkes*, 575 U.S. 822 (2015) (*per curiam*)).

[204] ECF Doc. No. 28 at ¶ 334.

[205] *Id.*at ¶¶ 74–80.

[206] *Id.* at ¶¶ 51–54.

[207] *Id.* at ¶ 79.

[208] *Id.* at ¶ 80.

[209] *Id.* at ¶ 42.  In  footnote ¶ 42(c), Mr. Snider alleges he "personally knows multiple grievants and litigants in the PA DOC who report this problem."

[210] 436 U.S. 658 (1978).

[211] *Monell*, 436 U.S. at 690 ("Local governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.")

[212] *Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 310, n.10 (3d Cir. 2020) (liability under *Monell* is limited to municipalities) (citing *Monell*, 436 U.S. at 690 n.54).

[213] *Lavia v. Pa. Dep't of Corr.*, 224 F.3d 190, 195 (3d Cir. 2000) (citing 71 Pa. Stat. Ann. § 61).

[214] *Iverson v. Flowers*, No. 12-1897, 2014 WL 4923173, at *4 (M.D. Pa. Sept. 30, 2014) (citing *Lavia*, 224 F. 3d at 195).

[215] ECF Doc. No. 28 at ¶ 335. Mr. Snider additionally brings a medical malpractice negligence claim against Dr. Sheikh under Pennsylvania law. We analyze the medical malpractice claim separately.

[216] *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Helling v. McKinney*, 509 U.S. 25, 32 (1993)).

[217] *Id.* (quoting *Estelle v. Gamble*, 429 U.S. 97, 104–95 (1976)).

[218] *Id.* (quoting *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999)).

[219] *Goodrich v. Clinton Cnty. Prison*, 214 F. App'x 105, 110 (3d Cir. 2007) (quoting *Monmouth County Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir.1987) (quotation and citation omitted)).

[220] *Id.* (citing *Inmates of the Allegheny Cnty. Jail v. Pierce*, 612 F.2d 754, 763 (3d Cir.1979)).

[221] *Id.* at 111 (quoting *Lanzaro*, 834 F.2d at 346 (quotation and citation omitted)).

[222] *Id.*(quoting *Lanzaro* at 346–47 (quotations and citations omitted)).

[223] *Pearson*, 850 F.3d at 535 (quoting *United States ex. rel. Walker v. Fayette Cnty.*, 599 F.2d 573, 575 n.2 (3d Cir. 1979)).

[224] *Id.* (internal citation omitted) and citing *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990)).

[225] ECF Doc. No. 89 at 29.

[226] *Id.*

[227] ECF Doc. No. 28 at ¶ 191.

[228] *Id.* at ¶¶ 192,193.

[229] *Id.* at ¶ 194.

[230] *Id.* at ¶ 228.

[231] *Id.* at ¶¶ 228, 229.

---

[232] *Id.* at ¶ 257.

[233] *Id.* at ¶¶ 258–261.

[234] *Id.* at ¶¶ 70, 71, 97, 181–184, 214–215.

[235] ECF Doc. No. 28 at ¶ 336. We analyze Mr. Snider's Americans with Disabilities Act and Rehabilitation Act claims together because "the substantive standards for determining liability are the same." *Furgess v. Pennsylvania Dep't of Corrections*, 933 F.3d 285, 288 (3d Cir. 2019) (citing *McDonald v. Com. of Pa., Dep't of Pub. Welfare Polk Ctr.*, 62 F.3d 92, 95 (3d Cir. 1995)).

[236] *Disability Rights New Jersey, Inc. v. Commissioner, New Jersey Dep't of Human Servs.*, 796 F.3d 293, 301 (3d Cir. 2015) (citing *Tennessee v. Lane*, 541 U.S. 509, 517 (2004)).

[237] 42 U.S.C. § 12132. State prisons are "public entities" under Title II. *See Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206, 210 (1998). Similarly, the Rehabilitation Act provides, inter alia, "[n]o otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service. . . .." 29 U.S.C. § 794(a). Mr. Snider alleges the Department of Corrections receives federal funding. ECF Doc. No. 28 at ¶ 20.

[238] 42 U.S.C. § 12131(2) (emphasis added).

[239] *Harris v. Mills*, 572 F.3d 66, 73 (2d Cir. 2009).

[240] *Muhammad v. Court of Common Pleas of Allegheny Cnty., Pa.* 483 F. App'x. 759, 763 (3d Cir. 2012) (quoting 28 C.F.R. § 35.130(b)(7)) (citations omitted).

[241] *Furgess,* 933 F.3d at 288–89 (citing *Chambers ex rel. Chambers v. Sch. Dist. of Phila.*, 587 F.3d 176, 189 n.19 (3d Cir. 2009)).

[242] *Waters v. Amtrak*, 456 F.Supp.3d 666, 671 n. 43 (E.D. Pa. 2020).

[243] *Furgess*, 933 F.3d at 289 (citing *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 263 (3d Cir. 2013)).

[244] *Id.* at 292 (citing *S.H. ex rel. Durrell*, 729 F.3d at 265).

[245] ECF Doc. No. 28 at ¶ 336 (emphasis added).

[246] *Id.* at ¶¶ 90, 174, 184, 187, 215.

[247] *Disability Rights New Jersey, Inc. v. Commissioner, New Jersey Dep't of Human Servs.*, 796 F.3d 293, 301 (3d Cir. 2015) (quoting *Yeskey v. Pa. Dep't of Corr.*, 118 F.3d 168, 171 (3d

Cir.1997), *aff'd sub nom. Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206 (1998) and citing 28 C.F.R. § 35.130(b)(1)(vii)).

[248] 28 C.F.R. § 35.130(b)(1) (emphasis added).

[249] ECF Doc. No. 89 at 8 (internal citations omitted).

[250] ECF Doc. No. 28 at ¶¶ 82–94, 174.

[251] *Id.* at ¶¶ 89–91.

[252] *Disability Rights New Jersey, Inc.*, 796 F.3d at 304 ("The fatal defect in [plaintiff's] ADA claim is that this right does not exist in New Jersey for nondisabled people, which means the denial of that right to psychiatric patients is not discriminatory.").

[253] ECF Doc. No. 28 at ¶¶ 98–104.

[254] *Id.* at ¶ 101.

[255] *Id.* at ¶¶ 150–160.

[256] *Yeskey*, 524 U.S. at 211.

[257] ECF Doc. No. 28 at ¶ 98.

[258] *Id.* at ¶ 157.

[259] *Id.* at ¶¶ 85, 87-90, 98-101, 174.

[260] *Id.* at ¶¶ 184, 187, 215.

[261] 64 F. Supp. 2d 1014 (D. Kan. 1999).

[262] *Id.* at 1032–33.

[263] *Id.*

[264] ECF Doc. No. 28 at ¶ 330.

[265] *Datto v. Harrison*, 664 F.Supp.2d 472, 493 (E.D. Pa. 2009) (citing *A.W. v. Jersey City Pub. Sch.*, 486 F.3d 791, 804 (3d Cir.2007).

[266] Section 12203 prohibits:

(a) Retaliation

No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

(b) Interference, coercion, or intimidation

It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

42 U.S.C. § 12203.

[267] *Talley v. Clark*, No. 18-5315, 2019 WL 3573524, at *3 (E.D. Pa., Aug. 5, 2019) (citing *Fogleman v. Mercy Hosp. Inc.*, 283 F.3d 561, 567-68 (3d Cir. 2002)). The elements of an ADA retaliation claim are developed in the context of employment discrimination under Title I. Mr. Snider's claims arise under Title II, the state and local government services provision of the ADA. Neither party argues a different set of elements apply.

[268] *Fogleman*, 283 F.3d at 570 (quoting *Mondzelewski v. Pathmark Stores, Inc.* 162 F.3d 778, 789 (3d Cir.1998)).

[269] *Wishnefsky v. Salameh*, No. 15-148, 2016 WL 11480717, at *6 (W.D. Pa., Nov. 18, 2016), *report and recommendation adopted by*, No. 15-148J, 2016 WL 7324080 (W.D. Pa. Dec. 16, 2016) (citing *Romero v. Allstate Ins. Co.*, 3 F. Supp. 3d 313, 335 (E.D. Pa. 2014)).

[270] *Romero*, 3 F. Supp. 3d at 335 (quoting *Wray v. Nat'l R.R. Passenger Corp.*, 10 F.Supp.2d 1036, 1040 (E.D.Wis.1998)).

[271] *Romero*, 3 F. Supp. 3d at 335 (quoting *Breimhorst v. Educ. Testing Serv.*, No. 99–3387, 2000 WL 34510621, at *7 (N.D. Cal. Mar. 27, 2000)).

[272] *See Datto*, 664 F. Supp. 2d at 490–92 (individual liability may be imposed for retaliation claims under the ADA involving either public entities or public accommodations) and *Douris v. Schweiker*, 229 F. Supp. 2d 391, 396–97 (E.D. Pa. 2002) (no individual liability for retaliation under the ADA).

[273] ECF Doc. No. 67 at 10.

[274] *Roberts v. Pennsylvania Dep't of Public Welfare*, 199 F.Supp.2d 249, 252 (E.D. Pa. 2002); *Griffin v. Municipality of Kingston*, 453 F. App'x 250, 253 n.6 (3d Cir. 2011)); *Evans v. Rozum*, No. 07–230J, 2009 WL 5064490, at *24 (W.D. Pa. Dec. 17, 2009). *But see Talley v. Wetzel,* No. 18-230, 2020 WL 2113670, at *6, n.6 (W.D. Pa. May 4, 2020) (denying *pro se* prisoner's request the court analyze his ADA retaliation claim with his First Amendment retaliation claim "because the elements of the two retaliation claims are not the same.").

---

[275] ECF Doc. No. 28 at ¶ 100.

[276] *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 188 (3d Cir. 2010) (prohibited discrimination under the ADA includes retaliation against an employee for requesting an accommodation) (citing *Shellenberger v. Summit Bancorp*, 318 F.3d 183, 191 (3d Cir. 2003); *Mascioli v. Arby's Rest. Grp., Inc.*, 610 F.Supp.2d 419, 448 (W.D. Pa. 2009) (citing *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 759 n. 2 (3d Cir.2004) and *Shellenberger*, 318 F.3d at 190–91).

[277] *See e.g.* ECF Doc. No. 28 at ¶¶ 135–142.

[278] *Furgess*, 933 F.3d at 288–89 (citing *Chambers ex rel. Chambers v. Sch. Dist. of Phila.*, 587 F.3d 176, 189 n.19 (3d Cir. 2009)).

[279] 42 U.S.C. § 12102(1).

[280] 42 U.S.C. § 12102(3)(A).

[281] ECF Doc. No. 28 at ¶ 337.

[282] ECF Doc. No. 89 at 33.

[283] ECF Doc. No. 28 at ¶ 42.

[284] 28 C.F.R. § 35.130(b)(7)(ii).

[285] ECF Doc No. 28 at ¶ 40.

[286] ECF Doc. No. 89 at 24-25.

[287] *Id.* at 26.

[288] U.S. CONST. amend. V.

[289] *B & G Const. Co., Inc. v. Director, Office of Workers' Comp .Programs*, 662 F.3d 233, 246 n. 14 (3d Cir. 2011); *Nguyen v. U.S. Catholic Conference*, 719 F.2d 52, 54 (3d Cir. 1983).

[290] U.S. CONST. amend. XIV, § 1.

[291] *Paul v. Davis*, 424 U.S. 693, 712 (1976).

[292] *Baraka v. McGreevey*, 481 F.3d 187, 208-09 (3d Cir. 2007). *See also Hill v. Borough of Kutztown*, 455 F.3d 225 (3d Cir. 2006) ("[t]o make out a due process claim for deprivation of a liberty interest in reputation, a plaintiff must show a stigma to his reputation *plus* a deprivation of some additional right or interest").

[293] 42 Pa. Cons. Stat. Ann. § 8343(a).

[294] *Elia v. Erie Ins. Exchange*, 634 A.2d 657, 660 (Pa. Super. Ct. 1993) (citing *Zartman v. Lehigh Cnty. Humane Soc.*, 482 A.2d 266 (Pa. Super. Ct. 1984)).

[295] *Id.* (citing 42 Pa. Cons. Stat. Ann. § 8343(a); *Baker v. Lafayette Coll.*, 504 A.2d 247 (Pa. Super. Ct. 1986), *aff'd*, 532 A.2d 399 (Pa. 1987)).

[296] *Id.* (citing *Braig v. Field Commc'ns*, 456 A.2d 1366 (Pa. Super. Ct. 1983).

[297] *Feldman v. Lafayette Green Condominium Ass'n*, 806 A.2d 497, 500 (Pa. Commw. Ct. 2002) (citing *Kryeski v. Schott Glass Tech.*, 626 A.2d 595 (Pa. Super. Ct. 1993)).

[298] *Feldman*, 806 A.2d at 500 (citing *Baker v. Lafayette Coll.*, 532 A.2d 399 (Pa. 1987)).

[299] *Bell v. Mayview State Hosp.*, 853 A.2d 1058, 1061–62 (Pa. Super. Ct. 2004).

[300] ECF Doc. No. 28 at ¶ 182.

[301] *Id.* at ¶ 216.

[302] *Id.* at ¶ 221.

[303] *Id.* at ¶ 238.

[304] *Id.* at ¶ 265.

[305] *Id.* at ¶ 282.

[306] *Id.* at ¶ 289.

[307] *Id.* at ¶ 272.

[308] ECF Doc. No. 89 at 25.

[309] *Id.* at 10-11.

[310] Pa. R. Civ. P. 1042.3(a).

[311] *Perez v. Griffin*, 304 F. App'x 72, 74 (3d Cir. 2008). *See also, Wilson v. Horowitz*, No. 18-2237, 2020 WL 86618, at *7 (M.D. Pa. Jan. 6, 2020) (Rule 1042.3 is a rule of substantive state law which plaintiffs in federal court must comply) (collecting cases).

[312] *Id.*

[313] *Id.* (citing Pa. R. Civ. P. 1042.6).

[314] *Id.* (citing *Womer v. Hilliker*, 908 A.2d 269, 279–80 (Pa. 2006)).

[315] ECF Doc. No. 43.

[316] ECF Doc. No. 50.

[317] ECF Doc. No. 53.

[318] *Snider I*, No. 15-951, ECF Doc. Nos. 292, 293.

[319] ECF Doc. No. 64.

[320] ECF Doc. No. 67.

[321] ECF Doc. Nos. 77, 80.

[322] ECF Doc. No. 89 at 35.

[323] *See Snider v. Gilmore*, No. 18-735, 2020 WL 5912805 (W.D. Pa. Oct. 6, 2020).

[324] *Id.* at *2.

[325] *Eaton v. Schuylkill Med. Ctr.*, No. 17-560 2018 WL 1726635, at *5 (M.D. Pa. Apr. 10, 2018) (citing *Jackson v. Superintendent Greene SCI*, 671 F. App'x 23, 24 (3d Cir. 2016); *Baumgardner v. Ebbert*, 535 F. App'x 72, 77 (3d Cir. 2013)).

[326] *See Foderngham v. Wetzel*, No. 18-202, 2019 WL 1405339, at *2 (M.D. Pa. Mar. 28, 2019).

[327] ECF Doc No. 73 at 14.

[328] ECF Doc No. 89 at 20.

[329] *Sanders v. Rose*, 576 F. App'x 91, 94 (3d Cir. 2014) (quoting Fed. R. Civ. P. 20(a)(2)(B)).

[330] *Id.* at 95.

[331] *Id.* at 94-95.

[332] Fed. R. Civ. P. 21.